BLACKMAN *v.* ANDREWS.

1. WILLS—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.
  The fact that testator, after the making of her will disposing
  of practically all of her property to proponent, her daughter,
  manifested the same affection as before for contestant,
  another daughter, gives rise to no inference that the will was
  procured by undue influence, but rather indicates the ab-
  sence of such influence.

2. SAME—FAILURE TO TESTIFY—EFFECT.
  The circumstance that proponent's husband, though present in
  court, and active in procuring the probate of a will, did not
  take the stand as a witness, is unimportant in the absence of
  evidence tending to prove the impropriety of his conduct.

3. SAME—EVIDENCE—SUFFICIENCY.
  Undue influence cannot be predicated upon mere opportunity
  for its exercise.

4. SAME—TESTAMENTARY CAPACITY—EVIDENCE—SUFFICIENCY.
  On the issue of testamentary capacity, evidence examined,
  and *held*, that the question should not have been submitted
  to the jury.

5. SAME—EVIDENCE—OPINIONS.
  Nonexpert witnesses, who testify to no facts or sayings incon-
  sistent with sanity, should not be permitted to state that in
  their opinions testator lacked testamentary capacity.

Error to Lenawee; Chester, J. Submitted October 16,
1907. (Docket No. 42.) Decided December 10, 1907.

Seraph C. Blackman presented for probate the last will
and testament of Eliza M. Straight, deceased. The will
was allowed in the probate court, and Eliza A. Andrews
appealed to the circuit court. There was judgment for
contestant, and proponent brings error. Reversed.

*Fellows & Chandler* and *Bird & Sampson*, for ap-
pellant.

*John L. O'Mealey* and *Smith, Baldwin & Alexander*,
for appellee.

CARPENTER, J. The object of this suit is to secure the probate of the will of Eliza Straight, who died in 1904, at the age of 78 years. The will was made in February, 1902, when testatrix was in her 76th year. Proponent and contestant are the children of testatrix and her only children. Each of these children is married and in comfortable circumstances. The contestant has no children, and it would seem from her age that she is likely to have none. Proponent has two children; one of them a son who is named after the husband of testatrix who has been dead several years. His name is Enoch Blackman. By her will testatrix bequeathed her homestead farm to · said grandson, Enoch Blackman. She bequeathed to contestant the sum of $500 during her lifetime, and no more. The remainder of her property, consisting of several thousand dollars, she bequeathed to proponent.

The circumstances attending the execution of the will were these: On the morning of February 26, 1902, testatrix rode with proponent's husband, Nathan Blackman, from her home in the country to Thompson's bank in the village of Hudson. On arriving at the bank Blackman left her. Testatrix then had an interview with Mr. Thompson and asked him to draft her will. Mr. Thompson suggested that it would be wiser to have the will drafted by Mr. Grant Fellows, the bank's attorney. To this testatrix assented. Mr. Fellows was called in, and testatrix told him just how she desired her will drawn. Mr. Fellows drew the will in accordance with her directions.

"Read it over to her and asked her if it was as she wanted it, and she said it was, and she said that she expected that Mrs. Andrews would not be satisfied with the provisions of the will; but she said Mrs. Andrews' people were comfortably well off, had a good home, and that the child which they had was an adopted child, and while she didn't blame Mrs. Andrews for that, she didn't feel as though she wanted the property to go outside of the family."

The will was then executed in the presence of Mr. Fel-

lows and Mr. Beall who was called in from the bank for that purpose, and they each signed it as subscribing witnesses. It cannot be claimed—and I do not understand that it is claimed—that there was any issue respecting the execution of the will to be submitted to the jury. Its execution was conclusively established. But the trial court left to the jury the question of testatrix's mental capacity, and the question of whether the will was procured by undue influence. The jury found that it was procured by undue influence and rendered a verdict disallowing the will.

The important questions for our consideration arise from the contention of proponent that there was no evidence justifying the submission to the jury, either the question of lack of testamentary capacity, or that of undue influence. In determining these questions, it should be borne in mind that the will was not an unnatural one. The slightest knowledge of human nature explains why testatrix should prefer her property to go to her own direct descendants rather than to a stranger, even though, as claimed by contestant, she had no dislike for her adopted grandson.

The first question for our consideration is this: Was there any evidence that the will was procured by undue influence? The person whom contestant charges with exercising undue influence is Nathan Blackman, the son-in-law of testatrix and the husband of proponent. After the death of her husband, which occurred in November, 1900, testatrix advised with her son-in-law Blackman and also with her son-in-law Andrews respecting her business affairs,—though it seems that she advised more with Blackman than with Andrews,—and during this time she was on terms of intimacy with Andrews as well as with Blackman. It cannot be said that Blackman ever improperly obtruded his advice or that he ever gave testatrix bad advice. In this connection it is proper to refer to a particular instance upon which contestant's counsel lay great stress, viz., Blackman advised testatrix after

her husband's death that she must take out letters of administration upon his estate. This was eminently proper advice, for one of the assets of the estate consisted of a mortgage which otherwise could not have been legally collected.

It is contended that it may be inferred that undue influence was exercised because, at the time the will was made, and ever afterwards until she died, the testatrix manifested the same affection for contestant. This claim is very remarkable. For the circumstance relied on indicates the absence of undue influence. Had testatrix manifested an aversion for contestant, the change in her affection would have been significant; it would have afforded ground for believing that some malignant minded person had poisoned her mind, and in that way exercised undue influence on her will. The contention under consideration is, in my judgment, based upon a misconception. The testatrix disposed of her property in the manner she did, not because she entertained more affection for proponent than for contestant, but because she preferred that property go to her own direct descendants rather than to a stranger. The notion that a parent can show his affection for a child only by giving something having a material value is utterly incorrect. It is a false idea of parental affection.

Emphasis is laid upon the circumstance that Blackman, though present in court, and active in endeavoring to procure the probate of the will, did not take the stand as a witness. This circumstance is utterly unimportant, unless contestant offered evidence tending to prove the impropriety of his conduct. The failure of a party to take the stand may strengthen the inference to be legitimately drawn from testimony in the case, but it does not warrant an inference in no manner justified by that testimony. If it were otherwise, the plaintiff in any suit could submit his case without testimony and demand a verdict and judgment because the defendant remained silent. The most that can be said in support of contest-

ant's claim that there was evidence of undue influence is this, viz., there was opportunity for its exercise. It is well settled that that is not enough. See *Severance* v. *Severance*, 90 Mich. 417. The trial court erred in submitting that issue to the jury.

*Second.* As this case must be remanded for a new trial, it is proper for us to determine whether there was any evidence which justified the trial court in submitting to the jury the question of testatrix's testamentary capacity. Up to the time of her death testatrix, assisted by the advice of her sons-in-law, managed her business affairs. Her right to manage them never was challenged. She managed them well. She made few if any mistakes. She possessed unusual natural capacity. In her conduct she exhibited marked independence of character and an intelligence far above the average. Several years before her death she had a stroke of paralysis which certainly did not permanently impair her mental vigor, but which did leave her lame and partially blind. In November, 1900, she lost her husband. She had lived with him for many years, and the relation between them was one of the deepest affection. It was claimed by contestant that, commencing from this time, she gave evidence of impaired mental capacity. And witnesses, upon observations detailed in their testimony, were permitted to testify and did testify, that, in their judgment, testatrix lacked capacity to make the will in question, and the opinions so given furnish the sole justification for the claim that the issue of testamentary capacity was properly submitted to the jury. Did these witnesses have any right to express the opinions they did? It is difficult to deal seriously with much of this testimony. One witness was of the opinion that testatrix lacked testamentary capacity because she was independent and set in her way, and because she wanted to live alone after her husband's death. Another testified that he did not think "a person who arrived at that age (77 or 78 years) is mentally competent to make a will or do business." Others

based their opinion of lack of testamentary capacity, either in whole or in part, upon the fact that by her will testatrix made an unequal distribution of her property.

After the death of her husband testatrix was melancholy and despondent, and both by word and action exhibited the peculiarities of despondency. At times she was preoccupied and disinclined to engage in cheerful conversation. These circumstances were thought by some witnesses to indicate testamentary incapacity. She often sat quietly in her chair and for a long time gazed out of the window. This circumstance was thought to indicate mental impairment. Their error will be apparent when it is understood that, owing to her impaired eyesight, testatrix could neither read nor sew, and that on most of these occasions she was doing the only thing she could do. In relating incidents that occurred long before, particularly in stating figures, she sometimes made mistakes, which, however, she recognized and corrected when they were brought to her attention. Sometimes, when engaged in conversation, she passed from one topic to another, and later recurred to the first. We scarcely need to say that this is not an uncommon characteristic of sane minds. For the purpose of restoring strength to her paralyzed limbs, testatrix occasionally ran about the garden, thus affording an exhibition, which, to say the least, was peculiar, but I do not understand that any witness thought —and he certainly had no ground to think—that it indicated insanity. Other peculiarities even less indicative of insanity were described. Not one of contestant's witnesses testified to a single act inconsistent with sanity; not one of them testified to a single saying inconsistent with sanity. Under the authority of *Hibbard* v. *Baker*, 141 Mich. 124, the opinions of these witnesses that testatrix lacked testamentary capacity should not have been received, and the trial court should have directed the jury to render a verdict admitting the will to probate.

Judgment reversed, and new trial ordered.

McALVAY, C. J., and OSTRANDER, HOOKER, and MOORE, JJ., concurred.