*In re* FAY'S ESTATE.

FAY *v.* MOST.

1. WILLS—MENTAL INCOMPETENCY—UNDUE INFLUENCE — BURDEN OF PROOF.
   In will contests the burden of proving mental incompetency, as well as undue influence, rests upon the contestant.

2. SAME—COMPETENCY—EVIDENCE—SUFFICIENCY.
   In a will contest evidence *held,* sufficient to show mental competency of testator.

3. SAME—UNDUE INFLUENCE—CHARACTER OF PROOF—EVIDENCE— CIRCUMSTANTIAL EVIDENCE—SUFFICIENCY.
   Undue influence may be shown by indirect and circumstantial evidence, but it must be evidence of probative force beyond mere suspicion.

4. SAME—UNDUE INFLUENCE—WHAT CONSTITUTES.

The test of the exercise of undue influence upon a testator is whether his free agency is destroyed and he acts under such coercion, compulsion, or constraint that the will does not truly proceed from him.

5. SAME—TESTAMENTARY CAPACITY—RIGHT OF TESTATOR.

Where a testator is of testamentary ·capacity, he has an absolute right to dispose of his estate as he chooses, even to the total exclusion of his heirs, or to give it to any one of them whom he prefers.

6. SAME—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.

The fact that a testator left more property to his son, who lived near him and with whom he had been in closer relations for many years, or that he left more to his four grandsons than to both his son and daughter, is not evidence of undue influence.

7. SAME.

The unfriendly and rude conduct of a preferred son and his wife towards a sister in connection with their father's sickness and funeral, or failure to notify her of the probation of his estate, has no legal probative force to establish the fact that the will of deceased, executed years before, was the result of undue influence.

8. SAME.

That after making his will testator continued to visit his daughter, to whom he had given very little of his property in his will, manifested the same regard for her, or assured her that she was well provided for in the will which he had made, does not raise any inference that he was unduly influenced in making it.

9. SAME.

Declarations of a testator as to whether a preferred son asked testator to make a will are inadmissible to show undue influence.

10. SAME.

Undue influence on a testator will not be inferred from opportunity.

11. SAME—TESTAMENTARY CAPACITY—UNDUE' INFLUENCE—MENTAL COMPETENCY—EVIDENCE—ADMISSIBILITY.

In a will contest, as bearing upon the questions of testamentary capacity and undue influence based on senile

decay, a liberal latitude of inquiry touching testator's domestic relations, peculiarities, habits of life, likes and dislikes, power to hold continuous conversations, statements showing condition of mind, etc., are admissible.[1]

12. SAME.

In a will contest the rejection of evidence of a conversation with a child that a preferred son asked testator about making a will and as to how testator came to talk with witness about the matter, was harmless error in view of convincing and undisputed evidence as to testator's mentality and state of mind at the time he made the will and evidence of capacity before and after making the will.

Error to Lapeer; Williams, J. Submitted April 13, 1917. (Docket No. 25.) Decided September 27, 1917.

Stephen Fay presented for probate the last will of Thomas Fay, deceased. The will was allowed, and Nellie Most appealed to the circuit court. Judgment for proponent. Contestant brings error. Affirmed.

*Florian, Moore & Wilson* (*Benjamin F. Reed*, of counsel), for appellant.

*Elmer Shumar* and *Theo. D. Halpin*, for appellee.

STEERE, J. Thomas Fay, whose will is the subject of this litigation, died on August 28, 1915, at the home of his son Stephen Fay in Goodland township, Lapeer county, Mich. He was then nearly 79 years of age, and his surviving heirs who would inherit his estate had he died intestate were his son Stephen, aged 53, with whom he had resided during most of the time since the death of his wife in 1909, and the contestant Nellie Most, a married daughter 49 years of age, then living in Highland Park village adjacent to Detroit.

Deceased was a farmer during his active years and

---

[1] On effect of unnatural testamentary disposition on the question of undue influence, see notes in 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

an early settler in Goodland township, where he had resided for about 60 years, having in 1855 purchased and established his home upon an 80 acres of land in that territory which is now part of his estate. As he was able and opportunity arose he made subsequent additions to his real estate until at the time of his demise he owned 260 acres of land. His estate, consisting mainly of farm land in Goodland township, is indicated to have a value somewhere between $17,000 and $20,000. His personal property, including deposits in bank, is approximated at $2,000. He left a will dated April 25, 1911, with a codicil attested August 14, 1914. Aside from the formal parts and customary provisions for an executor, payment of funeral expenses, just debts, etc., it disposes of his estate as follows:

"*Third.* I give, devise and bequeath to my son, Stephen Fay, the use and income of all my real estate during the term of his natural life.

"*Fourth.* I give, devise and bequeath to my grandsons, Laverne and Stephen Fay, Jr., equally, share and share alike, the east half of the west half of the northwest quarter of section eleven, town eight north, range twelve east, subject to life use thereof to Stephen Fay, my son, as mentioned in paragraph three.

"*Fifth.* I give, devise and bequeath to my two grandsons, Marcus Fay and Orlie Fay, equally, share and share alike, the rest and residue of my real estate subject to life use thereof of Stephen Fay, my son as above mentioned.

"*Sixth.* As a further consideration of the bequest of use and income of my real estate to my son, Stephen Fay, he is to pay my daughter, Nellie Most, the sum of six hundred dollars within one year after my death, or before that time at his option.

"*Seventh.* I give, devise and bequeath to my two grandsons, Laverne Fay and Stephen Fay, Jr., all personal property of every name and nature to be divided equally between them share and share alike."

The added codicil of 1914 is as follows:

"Thomas Fay, of Goodland, Lapeer county, Michigan, being of full age and sound mind, do hereby make and execute the following codicil to foregoing will: In paragraph seven, I give, devise and bequeath to my grandsons, Laverne and Stephen Fay, Jr., all personal property of which I die seised, I hereby revoke this paragraph wholly and after payment of my just debts and funeral expenses from 'personal,' I give devise and bequeath residue of same to my son, Stephen Fay, of Goodland, Michigan."

Both will and codicil were executed in compliance with statutory requirements, in the presence of two witnesses who signed the attesting clauses as such at his request, in his presence and in the presence of each other. Both were prepared at his request and on his initiative by the cashier of the Lapeer County Bank with whom he had been acquainted and done business for many years. When executed he left the will at the bank for safe-keeping, and also after the codicil was added.

The will and codicil were probated in the probate court of Lapeer county on petition of the son, Stephen Fay, and allowed as the last will and testament of deceased by an order in usual form dated October 11, 1915. Personal notice of the hearing was not served on the daughter, Nellie Most, and she was not present or represented in the probate court when the matter was heard. She thereafter took an appeal from the order probating the will to the circuit court of Lapeer county where on trial by jury the order of the probate court was affirmed and the will sustained.

Aside from certain technical objections which are not seriously pressed here and need not be discussed, the more important grounds of contest urged against the validity of the will in the trial court, and to which the testimony was chiefly directed, were undue influence and unsoundness of mind, or lack of testamentary capacity. Many witnesses were called and examined along that line of inquiry.

The trial court submitted contestant's claim of deceased's mental unsoundness and lack of testamentary capacity to the jury, under fair and full instructions upon that issue, but held as a conclusion of law that there was no competent evidence of undue influence to carry the contention to the jury, and refused to submit it as an issue of fact for their determination. This refusal and rulings of the court adverse to certain questions of contestant, which it is claimed excluded a line of competent testimony tending to show undue influence, are the questions most strenuously urged and worthy of consideration.

Deceased was a native of Ireland, coming to America when a boy. He was possessed of an inquiring and active mind. After he had married and settled in Goodland township he gradually prospered as a successful and thrifty farmer. He is described by his neighbors as a man of business ability within the range of his calling, intelligent, well-informed, positive in his opinions, and with a marked individuality. His strength of character, independence, and intelligence when in possession of his normal faculties are not questioned; the issue being directed to claimed mental decadence during the closing years of his life, which contestant dates from the death of his wife in 1909, saying, "I don't think he was ever right after mother died."

Deceased's characteristics as noted and described by old neighbors and other acquaintances of long standing mark him as a vigorous minded man, a reader, and apparently well informed, independent, and positive in his views, disposed to form his own conclusions, and given to stoutly contending for them when questioned, especially upon religious matters and construction of the Scriptures, in which he was actively interested. He was a prompt and regular attendant at the country church in his neighborhood, and it is

related that during the services he sometimes expressed approval of the doctrine preached with a loud "amen," while at other times he manifested disapproval in a manner which attracted attention. An old neighbor who was in the same Sunday school class with him for years said:

"He was a very logical reasoner and quoted more Scripture than most any other person in the class; * * * he was quite set in his ways."

This witness states that he observed no signs of forgetfulness or failing mentality, and up to the time he removed from the neighborhood in December, 1911, deceased remained the same in mind, manner, and church activities.

His relations with his two children were always friendly so far as shown, both before and after they married and left his home, although the drift of their lives in later years brought him in closer association with his son than with his daughter. The only disclosed unpleasantness in any of their family relations was some ill feeling of long standing between contestant and Stephen's wife, and perhaps for a time with other members of the family, which Stephen's wife states had its origin when "the difficulty arose concerning my character." The circumstances of this affair are not shown, and it is only mentioned by her in vindication of her rude and discourteous conduct towards contestant when she called to inquire for her father the summer before he died. That the two women were not on visiting terms and avoided each other so far as possible is made plain, but the relations of deceased with his children and their families, and of his two children with each other, were apparently friendly.

Stephen stuck to the calling at which he was raised, remaining at home and working on his father's farm until some time after his marriage, when he bought a

40 acres within 100 rods of his parents' home, and, after repairing some old buildings upon it, established his home there, subsequently adding to his holdings an adjoining 40 acres. He thereafter made that 80-acre farm his home, where he permanently resided with his wife and children in close proximity to and association with his parents as long as they lived.

The daughter, Nellie, married and left the neighborhood, at what time and age is not shown, but she makes mention of her father paying off a mortgage of between $400 and $500 on her place "soon after the death of my husband, Mr. Sommerville," and had been married over 12 years to her subsequent husband, Mr. Most, a contractor, with whom she was living at Highland Park, apparently in good circumstances when her father died.

Stephen, who remained with or near his father all his life, was helpful to him, and had from boyhood until his father's death worked more or less upon the farm which deceased left to Stephen's sons. He continued to work for his father for a time after he was married, and later worked the place on shares, assisted by his boys as they grew up. He is described as an industrious and competent farmer, and his boys are said to be steady, industrious, and good workers. They remained with their parents after they grew up, and followed farming, working from time to time on their grandfather's farm. The substance of the undisputed testimony of numerous witnesses of that community as to Stephen standing by his father is summed up by one of them as follows:

"Stephen Fay helped to make that farm a good farm. He worked there ever since he was a boy. As long as Thomas Fay lived on his own farm he did his own business, and Stephen went ahead with the work."

Stephen was working his father's farm on shares when his mother died. After her death testator went

to live with Stephen. He then sold his stock and other personal farm property and rented his place to Stephen for $150 per year and the taxes. His years of business activity were then over and his old home broken up by the death of his wife, whom it is said he greatly missed and mourned. He had an abundance at his command in his own name to use as he saw fit, was free to go where and able to live as he chose. He preferred to make his home with Stephen in the community where he had lived so many years, near his old home, where he had raised his family and where his wife of half a century had died. He went and came as he was inclined, going at times to visit his daughter Nellie, where he was welcome and remained so long as he cared to, first at Brown City, where she resided with her husband until the spring of 1912, and later at their home in Highland Park. He first visited them and stayed for a time during the winter following his wife's death in 1909, and the last visit he made them was at Highland Park in 1914, when he remained about two weeks and went home alone by train. The Thanksgiving before contestant left Brown City he went to her home and remained until the February following. He had then already made the will in controversy here, so far as it related to her. The subsequent codicil was only to make a change of the interests in that portion of his estate left to Stephen and his sons.

After deceased had made his home with his son for near a year and a half, in the meantime visiting his daughter's home as often as he wished, he went, on April 25, 1911, alone and without the knowledge or solicitation of any member of his family, as they all testify, to the Lapeer County Bank, at Imlay City, of which he then was and had been a customer for many years, and requested its cashier, John Boland, Jr., whom he had known for 37 years, to make his will for

him. This being assented to, he related how he desired to dispose of his estate, of which Boland made a memorandum in writing. From this he prepared the will as dictated by testator. John Boland, Sr., an old gentleman who had known deceased for 50 years, and describes him as "always quite positive," was present at the bank, and with his son witnessed deceased's execution of the will at testator's request. After he had executed the instrument he left it at the bank with the cashier for safe-keeping. In 1914 he again went to the bank alone, and requested the cashier to make the change for him in his will appearing in the codicil, which he executed after it was prepared as he desired and read over to him, again leaving the instrument there for safe-keeping. A clerk in the bank who knew deceased acted as one of the witnesses on that occasion. These three witnesses to the instrument, who knew deceased well and long, testified positively that on both occasions he came alone, to all appearances was in full possession of his mental faculties, knew and told what property he had and how he wanted to leave it, and that there was nothing in his manner or appearance to indicate he was disturbed in mind, acting under undue influence or on the suggestion of any one else. The cashier who drew the instrument testified:

"I did not at any time obtain any of the information that enabled me to draw the will and codicil from any other person than Thomas Fay."

Deceased survived his wife about 6 years, and lived over 4½ years after he had made this will, which remained in the bank, unchanged as to contestant. The principal part of his·estate, consisting of realty, he left to his four grandsons, burdened with a life estate to their father. They perpetuated the pioneer family name in that locality to the third generation, and had grown up under testator's observation; were industrious young men who had remained at home in the com-

munity where they were raised to follow the calling of their father and grandfather. With his son and daughter otherwise comfortably provided for, it was not a strange or unnatural thing under such circumstances for him to make these grandsons the chief objects of his bounty and provide that his old homestead and land holdings should ultimately be theirs.

The testimony of claimant and certain of her witnesses was to the effect that after his wife died testator aged rapidly, and manifested evidence of *senile dementia;* that he became childish, forgetful, and irritable, at times manifesting his mental weakness by crying, talking to himself, failing to recognize those whom he knew well, etc., his mind being enfeebled to such an extent that in their opinion he was not capable of recalling what property he owned or who his heirs were, nor of independently deciding upon, dictating, or understanding the nature and contents of his will. While proponent testified and introduced evidence by many witnesses, old neighbors and long acquaintances, who knew and saw him frequently after his wife's death, to the effect that until near the time of his own death his mind was active and his mental faculties well preserved; that he retained his interest in current events, was able to discuss intelligently his business affairs and the various subjects which interested him, asserting as positive views as formerly, and was, in their opinion, capable of independently exercising his judgment in the disposition of his property by will, with full knowledge of what he possessed and who his lawful heirs were, and to dictate the same without prompting or suggestion.

The jury found against contestant on the issue of mental incompetence, and their verdict is supported by an abundance of convincing testimony, given by many apparently disinterested witnesses. In will contests the burden of proving mental incompetency, as

well as undue influence, now rests upon contestant (*Soule* v. *Henry, ante*, 473 [163 N. W. 944]), but, were the burden of proof in this State as formerly, the propriety of the verdict as to testamentary capacity would not, in our opinion, be open to question. With that established, testator's undisputed natural intelligence, independence of mind, and positive disposition when in control of his faculties militate strongly against the theory of undue influence; although not necessarily conclusive, as a matter of law, if competent evidence of the exercise of an undue and dominating influence over him was in the case.

The record is destitute of any direct proof of acts or efforts by Stephen or his family, or by any one for them, to unduly influence deceased to dispose of his property otherwise than as he independently desired. Contestant claims, however, that there was sufficient inferential evidence in the case to carry the question to the jury, that in connection with the evidence of testator's weakened mental condition, with the unnatural disposition of his estate and testimony of testator that he told her he intended to divide his property between his two children and had made a will in which she was well provided for, together with proof of rude and unfriendly conduct towards her by Stephen and his wife before and at the time of testator's death and funeral, followed by failure to name or notify her in the proceedings to probate his will, all taken together fairly justify an inference of undue influence on their part, and raise an issue upon that contention which it was error to withdraw from the jury. Unquestionably undue influence may be shown by indirect and circumstancial evidence, but *it* must be evidence of probative force beyond mere suspicion, and we do not think it can be fairly said as a matter of law that the incidents urged raise inferences that deceased's free agency was destroyed and he acted under

such coercion, compulsion, or constraint that the will did not truly proceed from him according to his wishes, which is the test of undue influence. *In re Williams' Estate*, 185 Mich. 97 (151 N. W. 731).

As before intimated, it cannot be said that testator's disposition of h.s property was so contrary to natural justice as to raise the inference it was against his own judgment and desire. If of testamentary capacity, he had absolute right to dispose of his estate as he chose, even to the total exclusion of his heirs or to give it to any one of them whom he preferred. He had helped his daughter during her widowhood, and he remembered her in his will. That he left more to his son, who lived near him and with whom he had been in closer relations for many years, or that he left more to his four grandsons than to both his son and daughter, is not any evidence of undue influence under the circumstances disclosed here.

"This court has often said that the mere fact that decedent so disposed of his property as to do an apparent injustice to one or more of his relatives would not nullify the transaction. Courts are not permitted to make equitable distribution of estates, but are concerned only in giving effect to the legal acts of decedents." *Pritchard* v. *Hutton*, 187 Mich. 355 (153 N. W. 705).

See, also, *In re Merriman's Appeal*, 108 Mich. 454 (66 N. W. 372).

The unfriendly and rude conduct of Stephen and his wife towards his sister in connection with their father's sickness and funeral, or failure to notify her of the probation of his estate, while a reflection on them which might give rise to surmise and criticism, has no legal probative force to establish the fact that deceased's will executed years before, was the result of undue influence. Neither do the facts that after making his will deceased continued to visit his daughter,

manifested the same regard for her, or assured her that she was well provided for in the will which he had made, raise any inference that he was unduly influenced in making it. *Blackman* v. *Andrews*, 150 Mich. 322 (114 N. W. 218).

Of those complained of, perhaps the most questionable ruling by the court was in sustaining objections to the following questions:

"*Q.* Mrs. Most, what did your father say to you about your brother Stephen Fay asking him to make a will?

"*Q.* How did he ever talk with you about it; that Steve wanted him to make a will, your brother Stephen?"

As framed, the indicated object of these questions was to show undue influence. The objection seems to have been argued and decided upon that theory, although counsel eventually stated, after a ruling was had, that the testimony was offered as bearing upon testator's state of mind when he made the declaration. No effort or offer was made to show when such conversations took place, and each of the questions assumed a fact not proved. Claimant had, however, testified that her father told her he had made a will, soon after he did so, and that when he visited her the last time (which was in 1914) he told her she was well provided for in his will. In *Zibble* v. *Zibble*, 131 Mich. 656 (92 N. W. 348), it is said that such declarations are admissible as bearing upon the testator's state of mind, and "may be shown to establish everything pertaining to the testator himself, as distinguished from matters which go to show the act of influence." Other testimony had been introduced in that case tending to show direct efforts and acts of testator's wife in the exercise of an undue influence upon him, and it was recognized that, in connection with other affirmative proof of the fact of undue in-

fluence, it was competent to show his declarations as to her importunities for its bearing upon his state of mind, but this court there held that refusal of a request to charge that his declarations upon the subject were not evidence of undue influence was error, and reversed the case. That such declarations by the deceased are not evidence of undue influence and cannot be received for that purpose is well settled; neither will undue influence be inferred from opportunity. *Leffingwell* v. *Bettinghouse*, 151 Mich. 513 (115 N. W. 731); *In re Kennedy's Estate*, 159 Mich. 548 (124 N. W. 516, 28 L. R. A. [N. S.] 417, 134 Am. St. Rep. 743, 18 Am. & Eng. Ann. Cas. 892); *In re Provin's Estate*, 161 Mich. 28 (125 N. W. 743); *Pritchard* v. *Hutton, supra.* The trial court correctly ruled that no substantive proof was made or offered of facts with inferential force sufficient to carry the question of undue influence to the jury.

It is true that in this class of cases, involving the two claims of testamentary incapacity and undue influence based on senile decay, a liberal latitude of inquiry touching testator's domestic relations, habits of life, likes and dislikes, peculiarities, power to hold continuous conversation, statements showing condition of mind, etc., is recognized as permissible. Aside from the one somewhat narrow ruling referred to, this record discloses that free and wide range was allowed by the court in that particular. While the inquiry suggested by the two questions adversely ruled upon might have been permissible as bearing upon testator's state of mind when he made the declarations, they were technically objectionable, and not admissible to show undue influence in any event. We are not prepared to hold that their rejection was reversible error in the light of the convincing and undisputed testimony as to testator's mentality and state of mind when he made his will on April 25, 1911, by all the wit-

nesses then present and the circumstances surrounding the transaction, together with the volume of supporting evidence by apparently disinterested witnesses as to his understanding and capacity at about that time, both before and after the will was executed.

Upon this record as a whole we find no occasion to question or disturb the result reached, or any error which can be affirmatively found to have resulted in a miscarriage of justice.

The judgment is therefore affirmed.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE, and FELLOWS, JJ., concurred.