*In re* MURRAY'S ESTATE.

NOON *v.* MURRAY.

1. WILLS — APPEALS FROM PROBATE COURT — CIRCUIT COURT RESTRICTED TO REASONS FOR APPEALING.

Under 3 Comp. Laws 1915, § 14145, in appealing from the probate court to the circuit court, the notice of appeal must give the reasons for such appeal and the circuit court is restricted to the reasons assigned and does not hear the cause *de novo.*

2. SAME—PLEADING—AFFIRMATIVE OF ISSUE.

Where contestant gave as one of the reasons for appealing from the probate court to the circuit court that the writing produced was not the will of testator, the proponent was put to proof upon the main issue and therefore had the affirmative.

3. TRIAL—AFFIRMATIVE—RIGHT TO OPEN AND CLOSE.

The party holding the affirmative of the issues has the right to open and close in a trial before the court or jury.

4. WILLS—AFFIRMATIVE—RIGHT OF PROPONENT TO OPEN AND CLOSE NOT CHANGED BY CONCESSION OF CONTESTANT.

Where contestant denied that the writing was the will of testator, his concession that it was signed by deceased and formally executed, and that the sole grounds of contest were undue influence and mental incompetency did not change the rule and give him the right to open and close.

5. WITNESSES—EVIDENCE—OPINION AS TO INSANITY NOT COMPETENT UNLESS FACTS GIVEN.

Nonexpert witnesses should not be allowed to give their opinions that a testator was mentally incompetent when they testify to no facts inconsistent with sanity.

6. SAME—COURT TO DECIDE WHEN OPINION COMPETENT.

It is for the trial court to say whether a witness is justified in expressing an opinion that testator was insane.

On effect of unnatural testamentary disposition on the question of undue influence, see notes in 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

On the question of admissibility of expert opinion as to sanity or insanity, see notes in 38 L. R. A. 721; 39 L. R. A. 331.

7. SAME—FACTS AS BASIS FOR OPINION—SUFFICIENCY.

Testimony by nonexpert witnesses as to testator's forget-fulness, of his repeating his words, and as to other trifling matters, gave no basis to support an opinion that he was mentally incompetent to execute the will in question, and the trial court properly so ruled.

8. WILLS—UNDUE INFLUENCE—INFERENCES—NATURAL JUSTICE.

A will leaving most of testator's property to his daughter, with whom he made his home, where the will itself shows no evidence of undue influence, and the record justifies the statement that testator at the time it was executed was unusually strong and vigorous, physically and mentally, his age considered, *held*, not so contrary to natural justice as to raise an inference that it was against his desire and the result of undue influence, although he was very fond of contestant, who had been a good son, and relied upon him and the daughter principally, where contestant had accumulated considerable property of his own.

9. SAME—MISTAKE OF SCRIVENER IMMATERIAL.

That the will speaks of grandchildren as "nieces," is in-sufficient to show undue influence of the daughter, whose nieces they were, where the scrivener testified that the mistake was his.

10. SAME—DESIRE OF CHILD FOR FATHER'S PROPERTY—UNDUE IN-FLUENCE.

If it may be inferred that the daughter desired testator's property and that she communicated that desire to him, that does not constitute undue influence.

11. SAME—OPPORTUNITY ALONE INSUFFICIENT TO ESTABLISH UNDUE INFLUENCE.

Opportunity alone cannot give rise to a valid inference that undue influence has been exercised.

12. SAME—EVIDENCE—SUFFICIENCY.

Evidence *held*, insufficient to raise an issue for the jury on the question of undue influence.

Error to Jackson; Williams (Benjamin), J. Submitted May 2, 1922. (Docket No. 66.) Decided June 5, 1922.

Agnes Noon presented for probate the last will of Patrick Murray, deceased. The will was allowed in

the probate court, and George H. Murray appealed to the circuit court. Judgment for proponent. Contestant brings error. Affirmed.

*Richard Price* and *W. S. Cobb*, for appellant.

*Albert O. Reece* and *James J. Noon*, for appellee.

CLARK, J. Patrick Murray, 84 years of age, made a will in November, 1917, and died in August, 1919. He was survived by four children, William, George, Paul and Agnes, the youngest being 41 years of age. There were also grandchildren. The will gave three of the children of William, and three of the children of Paul $100 each. It gave to George $1,000, and the residue, about $15,000, to Agnes. George is the contestant. The allowance of the will was sustained in the circuit court and he, on error, presents three questions:

1. That as the burden of proving mental incompetency and undue influence now rests upon the contestant (Act No. 314, Pub. Acts 1915, chap. 17, § 58 [3 Comp. Laws 1915, § 12546]; *In re Curtis' Estate*, 197 Mich. 473; *In re Fay's Estate*, 197 Mich. 675), he had the right to open and close both as to proof and argument. When the jury had been sworn, counsel for defendant stated that it was conceded that the will was signed by Patrick Murray, that it had been formally executed according to the statute, that the sole grounds of contest were undue influence and mental incompetency, and requested permission to open and close. The request was refused.

In appealing from probate court to the circuit court a notice of appeal "giving the reason for such appeal" must be filed. 3 Comp. Laws 1915, § 14145. Here the notice of appeal by defendant, briefly stated, gave three reasons: (1) The writing is not the will of Patrick Murray, (2) mental incompetency, (3) undue

influence.    The circuit court was restricted to the reasons assigned and did not hear the cause *de novo*. *In re Beers*, 148 Mich. 300; *In re Ward's Estate*, 152 Mich. 218; *In re Broffee's Estate*, 206 Mich. 107. The first reason raised the one main issue in probating a will: Is the paper propounded the last will of the testator? *Barney* v. *Barney*, 187 Mich. 145. And it included all minor issues. See *In re Hathaway's Appeal*, 46 Mich. 326; 1 Beecher Mich. Law & Practice Probate Courts, p. 671. So upon the state of the record at the opening of the trial in the circuit court, under the reasons given by defendant, the plaintiff was put to proof upon the main issue. She had the affirmative. The rule is stated in 26 R. C. L. p. 1023:

"It has been said that the plaintiff always, in contemplation of law, has the affirmative and has the right to open and close, and statutes in some jurisdictions give this right to the plaintiff. The true rule, however, is that the party holding the affirmative of the issues has the right to open and close. The test is against whom would judgment be rendered if no evidence were introduced; that party has the right to open and close. Where without the introduction of any evidence the plaintiff would fail in the action, the burden of proof is on him and he has the right to open and close."

And in 38 Cyc. pp. 1300-1302:

"Ordinarily the right to open and close the argument is determined by the same considerations as determine the right to open and close the evidence, and the right to open and close is determined by the state of the pleadings at the beginning of the trial.  *  *  * The party to whom under the pleadings, in the absence of evidence for either party, the finding would necessarily be adverse has the right to open and close, with this modification, that where plaintiff's right to recover is admitted by the pleadings, but the amount of recovery beyond a mere nominal amount is in controversy, plaintiff is entitled to open and close. The general rule is that the party who asserts the affirma-

tive of an issue has the right to open and close in a trial before the court or jury."

Counsel sought to have the concession stand in lieu of evidence, but that does not avoid the rule. The court was right in refusing the request. That the rule would be otherwise had the reasons for appeal been limited to either the second or third reasons given or to both we need not here determine. Nor need we determine whether a ruling if erroneous would constitute reversible error. See 26 R. C. L. p. 1024.

2. That testimony was excluded erroneously. Upon the question of testamentary capacity certain non-expert witnesses were not permitted to express an opinion, on the ground that such witnesses had testified to no facts inconsistent with sanity.

Bidwell testified:

"I knew Patrick Murray about a year before he died. * * * I had a chance to talk with him; I got quite well acquainted with him. I observed that he repeated himself quite often, and I also observed his talking to himself a lot. He never had any conversation of enough importance to repeat, or that I remember particularly his repeating. He would ask me how George was, sometimes; generally would ask me that about twice if I knew how George was, on the same occasion. He would come to the place and ask how George was and I would tell him if I knew; and then he would often ask me over again. I bought some hay of him, I think it was a year ago, in April or May. George told me the old man had some hay and that I had better go over and see him, so the hired man and I went over there one day. We went over after the hay, and he told me I could not have it; he didn't have it to sell. The second day after that—I think it was either the second or third day after that—he was over to our place. We was in the barn. I think he saw I didn't have any hay—well, the day I was over after the hay—I guess maybe I have got a little ahead of my story—I said I was nearly all out and I says—coaxed him to let me have a little for the horses, to last a day or so.

"*Q.* How much?

"*A.* A few forkfuls, 250 pounds or such a matter. The second or third day after that he was over to our place and saw I didn't have any hay. He asked me what I was going to do for hay. I says: 'I don't know; I was depending on you for it.' He says: 'Well, I have got hay; you can have some,' and so I went over there immediately and got some—got a load. This was either the second or third day after he had refused to let me have any hay.

"*Q.* That was the second day after he had refused to let you have the hay?

"*A.* I am quite sure it was the second day, either the second or third day.

"*Q.* Did he make any reference to his former talk or any explanation of anything at all?

"*A.* No, sir, never referred to it.

"*Q.* Or indicate in any way he remembered his former talk with you?

"*A.* Didn't mention it."

Ottney testified:

"I noticed a change in him before he died. Different times I talked with him he seemed to be different than he used to be. He came along one time and I was in the barn which is right beside the road; this was about two years ago, I think this March, shortly after I came from the south, and I had been south two years ago this winter and came back the last of February and he came along and was on his way down to Dennis' to get him to butcher a couple of hogs for him, and he saw me there and came to the barn and asked me a few questions about the south, asked me how I liked it down there, and then he went on to tell me about his hogs, why he had to kill them, said one could not get up, and he didn't know what ailed it; said he fed it good and it had plenty of bedding, and he says: 'This morning when I went out it could not get up at all.' He said before that it could not get up by his helping him. He repeated that several times there, two or three times. We talked a little more about the south—I talked a little with him about the south, and he went on down to Dennis'. Left and went down to Mr. Dennis' place, and when he came

back, why I was there yet, and I talked with him afterwards and he repeated the same thing over and over to me; repeated the same story over to him, and I says to him: 'Mr. Murray'—I kind of laughed and says: 'You told me that when you went down.' 'Oh,' he says, 'I forgot that I had told you,' and he says: 'What would you do about it?' I says: 'If you can't get them up, you will have to dress them. Very often they get too fleshy and can't get up.' He went on home. He said he had to get somebody to kill them, and he went on home. That is the only time I remember about him repeating his conversation.

"There was another time I went over to the other place, got along in front of his place, I think it was the spring before, it was back quite a ways. It was along in June and he was cultivating early potatoes. Just before I got there he had got into a little trouble with his horse that he was using on the five-tooth cultivator. When I got there, I stopped. He was right beside the road. He was on the east side of the house, right beside of the road, and he—she was all tangled up then with the—she got over the tugs; stopped, and got her legs all mixed up with the tugs. That is generally the way they do get into trouble with that cultivator, and he got to telling me about it. He was quite excited, and he repeated that a couple of times to me that day, as I was going over; told me about it, and I finally went on and he got his horse straightened away and went on cultivating. There was another time he sold his apples to his neighbors there, that he sold them right on the tree to him and he came—later he found out some way that the prison would have given the same for all the windfalls and all as he could get for the picked apples, and he knew I had quite an orchard, and he asked me what I had done with mine, and I told him. 'Well,' he says; he says: 'That is the way it is when you can't run your own business,' but I didn't ask him what he meant by that. He says: 'I have got to kind of depend on the boys to do it.' I don't know what he said—what he meant by that. I didn't ask him because he was well worried about it; he was nervous; seemed to be nervous and flighty that day.

"*Q.* Have to depend on the boys?

"*A.* Yes, sir, had to depend on the boys.

"Q. Do you recall anything more, Mr.–

"A. No, I guess—I guess that is all.

"Q. Do you know anything about his putting tile down in a drain—ditch?

"A. Yes, sir, I know that ditch.

"Q. Tell us what you know about that.

"A. Why?

"He dug up the tile and took out the six-inch tile—well on the new tile on north—well, the outlet was southwest and run up towards him northeast; it kind of run kittering, and I think on the upper end there was four-inch tile and then running down to the road was six-inch and across the road was six-inch, and he dug them up and put in eight-inch. Dug up the six-inch and put in eight-inch tile, and I talked with him one day when he was right there by the road. He had to dig up the road to get across the road, and he was there. I talked with him, and I says, I asked him what he was doing. He said he was digging up that tile. He said he was going to put in larger ones. He hadn't drawn his tile, I think up there. He had some there, but he hadn't drawn them all. He said he was going to put in eight-inch tile. I says: 'That won't help your case any, Mr. Murray, because the tile—only six-inch tile below you.' Well, he said he was going to get the water out of his cellar anyway and run it down there. I says: 'It will back right up there because—unless you get them to take up the tile below you and clean them out.' They were filled on down. Well, he said he was going to do it anyway, put them in. They are there today, eight-inch tile above the six-inch.

"He told me several different times in my conversation with him that he was forgetful. He said he had got so he could not remember anything very long.

"Q. Well, now, you saw him very frequently, according to your statements, Mr. Ottney.

"A. Yes, sir.

"Q. You had known him a long time?

"A. Yes, sir."

Campbell testified:

"There was a considerable change in his demeanor. Mr. Murray had a retiring way; he wasn't demonstra-

tive; he ran up to me down there on the street one day and shook hands with me, which surprised me; it wasn't like him. He would not stay and talk very long; wasn't much of a conversation you could have with him. He would not stay and carry on a conversation; shake hands and went right away in a minute. That wasn't like him; he used to be sociable when you got to talking. I talked with him on some occasions during the last 3 or 4 years of his life. I rode out on the car from Jackson to Van Horn's with him once or twice. I remember one incident I was riding with him and he got to telling me about a tile drain or ditch that he had, would have to be some other tile put in or cleaned out or something to that effect, and then he repeated that after getting a little farther on; repeated the same thing over again."

Such witnesses should not be allowed to give their opinions that a testator was mentally incompetent when they testify to no facts inconsistent with sanity. *In re Walter's Estate,* 215 Mich. 572; *In re Ver Vaecke's Estate,* 214 Mich. 281; *Hibbard* v. *Baker,* 141 Mich. 124; *Roberts* v. *Bidwell,* 136 Mich. 191; *Blackman* v. *Andrews,* 150 Mich. 322.

In cases quite similar as to facts it was said:

"Several women acquaintances gave it as their opinion that she was not mentally competent to execute the will in question. Their reasons for so thinking were that she had failed in health after her sickness in 1912; that she had complained at times of her head; that she was at times forgetful, and at other times would repeat her words, and forget what she was conversing about. Nothing was detailed by them other than what comes to nearly every man and woman of her age, as a result of a gradual weakening of physical and mental powers. These reasons furnish no basis in support of an opinion that she was mentally incompetent to execute the will in question." *In re Wynn's Estate,* 193 Mich. 223.

"Instances of forgetfulness, habits of untidiness increasing with advancing years, and failure to exhaust

the subject of conversations, afford no evidence of lack of testamentary capacity." *Leffingwell* v. *Bettinghouse,* 151 Mich. 513 (quoting from syllabus).

"The practice of proving by a witness two or three instances of tears, forgetfulness, anger, or some other emotion or idiosyncrasy, of doubtful significance, as a ground, and then taking the opinion of the witness (frequently biased) that the person is insane or incompetent or without sufficient understanding or intelligence to do the act in question, is contrary to the rule, as we have often said." *Page* v. *Beach,* 134 Mich. 51."

It often may be difficult for a trial judge to determine whether a witness is competent to express an opinion. *Prentis* v. *Bates,* 93 Mich. 234 (17 L. R. A. 494). And the question is for the court to determine. *Paul* v. *Clements,* 176 Mich. 251. It is for the court to say whether a witness is justified in expressing an opinion. *In re Ver Vaecke's Estate, supra.* The testimony quoted of testator's forgetfulness, of his repeating his words, and relating to the tile and to other trifling matters gave no basis to support an opinion that testator was mentally incompetent to execute the will in question. The ruling was right.

3. That it was error to withdraw from the consideration of the jury the question of undue influence. George Murray, contestant, had been a good son. He stayed at home until he was 32 years of age, helped the father clear, improve, and pay for the farm of 82 acres. When he left, the father gave him $1,000. The father was fond of him, often inquired of him. William and Paul left home after completing high school. Agnes had attended high school about one year when her mother died. She quit school and stayed home several years until she married at the age of 24 years. Her father gave her some livestock and furniture. There is testimony that the father at one time intended to leave his property to George and

Agnes equally. But when the will was made conditions had changed. George owned a farm of 152 acres, a residence in Jackson and other property. There is credible testimony that his property was worth much more than his father's.

Testator, until his last illness, caused by an accident the month before his death, had done such business as he had. He sold livestock and hay, bought Liberty bonds and Savings stamps. He did farm work. He was injured by a fall, July 18, 1919, while working with his son George. We think the record justifies the statement that testator when the will was made and until the time of his accident was unusually strong and vigorous, physically and mentally, his age considered. Paul and William supported their sister in this contest.

During his last illness at the hospital, testator was visited by all his children. He expressed fondness for George and asked for him. He said: "I always thought so much of him. We worked together so much. I liked him so well." A witness who sat up with him at the hospital the next night but one after his accident testified:

"All he talked about was going to Agnes' house. He wanted to be taken to Agnes' and he wanted me to call up Agnes' house to come to him. I wouldn't count the times he said, 'I want to be taken to Agnes'. He said it all the time. I had hard work to keep him quiet until morning."

Testator repeated his request that he be taken to Agnes' house to several other persons. He died at her home.

The elements said to constitute undue influence most stressed by counsel are:

(1) The will speaks of the grandchildren as "nieces." It is urged that this shows the influence of Agnes whose nieces they were. The scrivener says it was his mistake.

(2) The will is unnatural and unjust.

(3) Agnes, informed of the contents of the will, had not told George frankly thereof, stating that the remainder after bequests to the grandchildren was left to George and her. Plaintiff contends that she did not indicate in what proportion and defendant insists that she said there was to be an equal division.

(4) That Agnes had talked with the father and he with her of a will more frequently than admitted by her.

The will itself shows no evidence of undue influence. Rather, we think it the result of the workings of a natural mind. Testator had the right, if of testamentary capacity, which the jury found, to dispose of his estate as he chose. The will is not so contrary to natural justice as to raise an inference that it was against his desire. See *In re Fay's Estate*, 197 Mich. 675; *Pritchard* v. *Hutton*, 187 Mich. 346; *In re Marx's Estate*, 201 Mich. 504. The use of the words "nieces" is without significance because of the testimony of the scrivener. We find no evidence that Agnes ever requested testator to leave her his property. But if it may be inferred that she desired his property and that she communicated that desire to him, that does not constitute undue influence. *In re Weber's Estate*, 201 Mich. 477. Opportunity alone cannot give rise to a valid inference that undue influence has been exercised. *In re Shanahan's Estate*, 176 Mich. 137. Agnes' kindness to the father, his affection for her, show why she was made an object of his bounty. And that George had become a man of considerable property will account for the father's leaving him but $1,000 instead of half of the estate, as he at one time intended. *In re Williams' Estate*, 185 Mich. 97.

We have read all the testimony relating to statements made by Agnes after the making of the will and all the evidence relating to undue influence, and

219—Mich.—6.

are of the opinion that thereby an issue on this question was not raised. We find the ruling not erroneous. See *In re Williams' Estate, supra; Leffingwell* v. *Bettinghouse, supra; In re Wynn's Estate, supra.*

No other question merits discussion.

Judgment affirmed.

FELLOWS, C. J., and WIEST, MCDONALD, SHARPE, MOORE, and STEERE, JJ., concurred. BIRD, J., did not sit.