*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* SHERROD ESTATE.

DEDRA ELAN MCBURROWS-SHERROD, as
Personal Representative,

        Appellee,

v

MICHAEL SHERROD,

        Appellant.

UNPUBLISHED
March 18, 2025
10:30 AM

No. 369863
Oakland Probate Court
LC No. 2022-410006-DE

Before: YOUNG, P.J., and O'BRIEN and SWARTZLE, JJ.

PER CURIAM.

This action concerns title to funds in a Diversified Members Credit Union (DMCU) account that belonged to decedent, Clyde Lamont Sherrod. The funds were originally to go to decedent's daughter, Dedra McBurrows-Sherrod, but in July 2022, decedent transferred the money to a new account and made the beneficiary of that new account his brother, appellant Michael Sherrod. Shortly after decedent passed away in October 2022, McBurrows-Sherrod, as personal representative of Clyde Lamont Sherrod's Estate, challenged Michael's title to the funds in the DMCU account on grounds of undue influence. Following a bench trial, the trial court found that (1) McBurrows-Sherrod had presented sufficient evidence to establish a presumption of undue influence, and (2) despite Michael's rebuttal evidence, McBurrows-Sherrod had established by a preponderance of the evidence that Michael unduly influenced decedent to name Michael the beneficiary of the DMCU account. Michael appeals that ruling as of right. We conclude that McBurrows-Sherrod failed to present sufficient evidence to establish a fiduciary or confidential relationship between Michael and decedent, which means that McBurrows-Sherrod failed to establish a presumption of undue influence. Without that presumption, McBurrows-Sherrod's undue-influence claim fails. For these reasons, as explained more fully in this opinion, we reverse.

-1-

# I. BACKGROUND

On March 28, 2022, decedent was admitted to the hospital with signs of heart failure, and a few days later on April 1, he underwent quadruple-bypass surgery. Decedent was discharged on April 13, 2022, but was readmitted to the emergency room on April 18, which resulted in another surgery being performed on April 30, 2022, to remove a portion of decedent's colon. Decedent was discharged on May 5, 2022, only to be readmitted to the emergency room the on May 7. During decedent's ensuing hospital stay, it was noted that decedent had become depressed due to his repeated hospitalizations and had lost significant weight since March 2022. Decedent was discharged to rehab on May 14, 2022, where he remained until June 2, 2022.

A short time after being discharged home, however, decedent was readmitted to the hospital, where he was diagnosed with episodic memory loss and dangerously-low blood pressure. The record is not a model of clarity, but it appears that, at some point shortly after this visit, decedent was discharged to a nursing home, where he remained until July 7, 2022.

It was during decedent's stay at the nursing home that Michael first visited decedent on July 2. Michael did not visit decedent at any point before July 2, despite knowing that decedent was in and out of the hospital. Michael justified his absence by explaining that he visited decedent when decedent called him, which was in July. Despite his absence, Michael testified that he had a close relationship with decedent. Others, however, testified that the two generally disliked each other. Regardless, Michael testified that, when decedent called him in July, Michael went to visit him, and after decedent was discharged, Michael would occasionally pick up decedent from his home to go out to lunch.

On July 11, 2022, Michael drove decedent to the police station, where decedent filed a report alleging that his daughter, McBurrows-Sherrod, was mismanaging his money and failed to take care of him. There was and still is no evidence to support this accusation. Nevertheless, decedent believed it, and due to his continuing concern about McBurrows-Sherrod's handling of his money, decedent asked Michael to take decedent to DMCU on July 13, 2022, so that decedent could remove McBurrows-Sherrod's access to decedent's account there. Michael agreed.

When the two arrived at DMCU on July 13, Michael pushed decedent's wheelchair to the office of the branch manager, Leah Lindsay. Michael stayed in Lindsay's office with decedent and Lindsay while decedent conducted his business, but Michael stayed mostly silent. Decedent asked Lindsay to remove McBurrows-Sherrod's power of attorney for decedent and to revoke her access to decedent's accounts, voicing his ongoing concern about McBurrows-Sherrod's handling of decedent's finances. Lindsay suggested that decedent resolve his concern by simply opening a new account, and decedent agreed. Decedent named Michael as the beneficiary for this new account. After the new account was created, the funds from decedent's old account were transferred to his new account. Michael did not tell McBurrows-Sherrod or anyone else in the family about either this trip to DMCU or the trip to the police station. He explained that he felt that he needed to keep the trips a secret because decedent told Michael that he was the only person that decedent could trust. Michael later took decedent to DMCU a second time because, when decedent created his new account, decedent's driver's license was expired, and he needed to provide a valid one. On this second trip to DMCU, Michael did not go into the bank with decedent.

On July 17, 2022—four days after creating the new DMCU account—decedent was readmitted to the hospital, and his records from that visit noted that decedent's memory was impaired. Dr. Anthony Martin, decedent's treating physician, opined that decedent's cognitive issue was likely caused by a lack of oxygen to decedent's brain. Dr. Martin explained that, when decedent was discharged in early July, he was given at-home treatment instructions to ensure proper blood flow (like wrapping his legs), but if decedent did not comply with his treatment plan, the result was a lack of oxygen to decedent's brain, affecting his cognitive abilities. In subsequent visits decedent had with Dr. Martin, Dr. Martin noted continuing issues with decedent's cognitive functions. When decedent was placed on oxygen during those visits, his confusion dissipated.

Decedent passed away on October 3, 2022. Lindsay testified that Michael called her on October 4 to inform her of decedent's death, and to start the process of closing decedent's DMCU account and sending the funds to Michael as the beneficiary.

Shortly thereafter, McBurrows-Sherrod filed an emergency ex parte motion seeking to enjoin Michael from withdrawing any funds from the DMCU account, which the trial court granted. This litigation seeking to settle ownership of the DMCU account ensued. Eventually, the lower court held a bench trial to determine whether Michael unduly influenced decedent to name him the beneficiary of the DMCU account. At the close of the trial, the court held that McBurrows-Sherrod established a presumption of undue influence and that Michael's rebuttal evidence was "much weaker evidence than the evidence offered to support the presumption of undue influence," so the court found by a preponderance of the evidence that Michael unduly influenced decedent to name Michael the beneficiary of decedent's DMCU account.

This appeal followed.

## II. PRESUMPTION OF UNDUE INFLUENCE

Michael argues the trial court erred by finding that McBurrows-Sherrod established a presumption of undue influence. We agree.

### A. STANDARD OF REVIEW

A probate court's findings following a bench trial are reviewed for clear error. *In re Estate of Bennett*, 255 Mich App 545, 549; 662 NW2d 772 (2003). "A finding is clearly erroneous when the reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Id*. This Court gives deference to trial courts on matters of credibility. *In re Estate of Erickson*, 202 Mich App 329, 331; 508 NW2d 181 (1993).

### B. ANALYSIS

Establishing that a will or contract was the result of undue influence vitiates the instrument because it establishes that the instrument was not the result of the testator's or contracting party's free will. See *In re McKeand*, 185 Mich 97, 120; 151 NW 731 (1915). "To establish undue influence it must be shown that the grantor was subjected to threats, misrepresentation, undue flattery, fraud, or physical or moral coercion sufficient to overpower volition, destroy free agency and impel the grantor to act against his inclination and free will." *In re Estate of Karmey*, 468

Mich 68, 75; 658 NW2d 796 (2003) (quotation marks and citation omitted). Certain circumstances are so suggestive of undue influence that, if those circumstances are established, it will give rise to a *presumption* of undue influence:

> The presumption of undue influence is brought to life upon the introduction of evidence which would establish (1) the existence of a confidential or fiduciary relationship between the grantor and a fiduciary, (2) the fiduciary or an interest which he represents benefits from a transaction, and (3) the fiduciary had an opportunity to influence the grantor's decision in that transaction. [*Id*. (quotation marks and citation omitted).]

The burden of proving undue influence rests "with the party asserting it." *In re Mardigian Estate*, 502 Mich 154, 160; 917 NW2d 325 (2018) (opinion of MARKMAN, J.).

The trial court here held that McBurrows-Sherrod presented evidence sufficient to establish a presumption of undue influence. On appeal, Michael takes issue with the court's finding that McBurrows-Sherrod established the first element of the presumption—the existence of a confidential or fiduciary relationship between Michael and decedent. Clearly, Michael and decedent did not have a traditional fiduciary relationship like attorney-client or physician-patient, see *In re Estate of Karmey*, 468 Mich at 74 n 3, but that is not necessarily fatal. A confidential or fiduciary relationship is a "broad" term, encompassing any relationship "in which there is confidence reposed on one side, and the resulting superiority and influence on the other." *In re Wood's Estate*, 374 Mich 278, 282-283; 132 NW2d 35 (1965). In this way, the term "has a focused view toward relationships of inequality." *In re Estate of Karmey*, 468 Mich at 74 n 3.

Trust alone is not sufficient to establish a confidential or fiduciary relationship. See *Knight v Behringer*, 329 Mich 24, 28; 44 NW2d 852 (1950). Rather, a confidential or fiduciary relationship requires "a reposing of faith, confidence and trust *and* the placing of reliance by one upon the judgment and advice of another." *In re Jennings' Estate*, 335 Mich 241, 244; 55 NW2d 812 (1952) (emphasis added). See also *In re Wood's Estate*, 374 Mich at 282 (stating that a confidential relationship embraces "those informal relations which exist whenever one man trusts in *and relies upon* another") (quotation marks and citation omitted; emphasis added). So, for instance, a confidential or fiduciary relationship exists when one trusts another and relies on that person "in handling the bank accounts for her," with the other person acting "solely as her agent in these transactions." *Van't Hof v Jemison*, 291 Mich 385, 393; 289 NW 186 (1939). See also *In re Estate of Swantek*, 172 Mich App 509, 514; 432 NW2d 307 (1988) ("A confidential relationship exists when a person enfeebled by poor health relies on another to conduct banking or other financial transactions."). Conversely, while people generally trust those they live with, living with another does not necessarily create a confidential or fiduciary relationship. See *In re Carlson's Estate*, 218 Mich 262, 265; 187 NW 284 (1922) ("We have not overlooked the fact that at the time the will was made the testatrix was living in the home of the proponent, and had been there several weeks . . . . The relation so established was not a fiduciary one, militating against the bequest to proponent."). See also *Knight*, 329 Mich at 29. Likewise, while people generally only allow those they trust to assist in their business affairs, assisting someone with their business affairs does not necessarily create a confidential or fiduciary relationship. See *In re Cottrell's Estate*, 235 Mich 627, 630; 209 NW 842 (1926) ("Before the burden can be cast on proponent, it must be shown that the fiduciary relations exist, and the fact that she was living with testator when the will was made

-4-

did not establish such relations, nor does the fact that she assisted him in his business affairs establish such relation.") (citations omitted). See also *Knight*, 329 Mich at 29; *Blackman v Andrews*, 150 Mich 322, 323-325; 114 NW 218 (1907) (holding that the contestants failed to establish undue influence despite showing that the proponent's husband drove the testatrix to the bank to change her will and had previously given her advice "respecting her business affairs").

Turning back to this case, the trial court found that, when decedent changed the beneficiary of the DMCU account to Michael, a confidential or fiduciary relationship existed between them. Despite finding that Michael generally lacked credibility, the court opined that "a lot of what Michael testified about supports the theory about a fiduciary relationship regarding this particular transaction and banking transaction." Specifically, the court opined that its finding of a confidential or fiduciary relationship between decedent and Michael was supported by Michael's testimony that (1) decedent "needed Michael Sherrod to help him" by driving him to the bank after he became "very suspicious of" McBurrows-Sherrod, (2) decedent told Michael "you're the only person I can trust," and (3) decedent "redirected all his mail to—to Michael's house with regard to financial issues."

This evidence was not sufficient to support a finding of a confidential or fiduciary relationship. That decedent trusted Michael is necessary for finding that a confidential or fiduciary relationship existed between them, but trust alone is not enough. See *Knight*, 329 Mich at 28. Rather, to establish that a confidential or fiduciary relationship existed between decedent and Michael, there needed to be evidence that decedent demonstrated his trust in Michael by placing reliance on Michael's judgment or advice, see *In re Jennings' Estate*, 335 Mich at 244, and there is no such evidence in the record. For instance, despite decedent's redirecting his financial statements to Michael's house, nothing in the record suggests that decedent gave Michael any control over decedent's finances such that decedent would have to trust Michael's judgment. Indeed, decedent did not even give Michael access to the funds in his DMCU account while decedent was alive—decedent only made Michael the beneficiary on his DMCU account. And while Michael drove decedent to DMCU in a trip that resulted in decedent naming Michael the beneficiary of decedent's account, this supports only that Michael had the opportunity to influence decedent; it does not support that a confidential or fiduciary relationship existed between them. See *Blackman*, 150 Mich at 323-325; *In re Brady's Estate*, 295 Mich 472, 474-476; 295 NW 230 (1940) (holding that "[n]o confidential relationship existed between either Mr. or Mrs. Knorpp and testator" despite evidence that the testator changed his will in front of the Knorpps, and the next day the Knorpps drove the testator to have his will executed and went into the office with the testator to do so).

We acknowledge that the trial court credited Dr. Martin's testimony that decedent may have been confused around the time of the transaction due to his ongoing medical issues, but we do not believe that this finding warrants a different result. That is, even if decedent was confused around the time of the transaction, it would not establish that a confidential or fiduciary relationship existed between Michael and decedent.[1] Again, a confidential or fiduciary relationship is

---

[1] It bears noting that decedent's confusion mostly manifested itself in his distrusting McBurrows-Sherrod. That distrust caused decedent to ask Michael to drive him to DMCU to remove

established when one places reliance on another's judgment or advice, see *In re Jennings' Estate*, 335 Mich at 244, and there is no evidence that decedent relied on Michael's judgment or advice.

For these reasons, we conclude that the trial court's finding that a confidential or fiduciary relationship existed between Michael and decedent was clearly erroneous. Without that finding, McBurrows-Sherrod cannot establish a presumption of undue influence. McBurrows-Sherrod has never argued that she presented sufficient evidence to establish undue influence absent a presumption, so our conclusion that McBurrows-Sherrod failed to establish the presumption of undue influence resolves this case.[2]

Reversed.

/s/ Adrienne N. Young
/s/ Colleen A. O'Brien
/s/ Brock A. Swartzle

---

McBurrows-Sherrod's access to his account, but it was Lindsay who suggested that decedent open a new account. When the new account was created, decedent named Michael the beneficiary.

[2] While it strikes us as unfair that decedent left his DMCU account to his brother (with whom he was estranged until recently) instead of his daughter (who faithfully remained by his side), this perceived unfairness does not justify court intervention:

> This court has often said that the mere fact that decedent so disposed of his property as to do an apparent injustice to one or more of his relatives would not nullify the transaction. Courts are not permitted to make equitable distribution of estates, but are concerned only in giving effect to the legal acts of decedents. [*In re Fay's Estate*, 197 Mich 675, 687; 164 NW 523 (1917) (quotation marks and citation omitted).]