*In re* VER VAECKE'S ESTATE.

BILLIET *v.* VER VAECKE.

1. WILLS—MENTAL INCOMPETENCY—EVIDENCE—SUFFICIENCY.
   In a will contest case, where testator left the bulk of his property to his housekeeper, evidence as to his mental incompetency, *held*, insufficient to go to the jury.

2. SAME—OPPORTUNITY FOR UNDUE INFLUENCE RAISES NO INFERENCE OF ITS EXERCISE.
   Opportunity alone is insufficient to raise an inference that proponent exercised undue influence in procuring the execution of testator's will in her favor.

3. SAME—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY.
   The finding of the jury that testator was unduly influenced by proponent in leaving her the bulk of his property to

---

The effect of unnatural testamentary disposition on question of undue influence is discussed in notes in 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

the detriment of his children, *held*, not supported by the record, and judgment for proponent ordered entered. SHARPE, J., dissenting.

Error to Wayne; Webster (Clyde I.), J. Submitted October 5, 1922. (Docket No. 18.) Decided June 21, 1923. Rehearing denied July 19, 1923.

Louise Billiet presented for probate the last will of Matheus Ver Vaecke, deceased. The will was allowed in the probate court, and Henry Ver Vaecke and others appealed to the circuit court. Judgment for contestants. Proponent brings error. Reversed, and judgment entered for proponent.

*Charles Bowles* and *John Loree*, for appellant.

*James H. Cullen* and *Keena, Lightner, Oxtoby & Hanley*, for appellees.

BIRD, J. This is a will contest. Louise Billiet, who was testator's housekeeper, is proponent. The children of deceased are contestants. The questions of mental incompetency and undue influence were both submitted to the jury and they found against the will. These issues were tried out on a former occasion in Wayne county with a like result. This court reversed it because the verdict was against the weight of the evidence (214 Mich. 281). The same questions are again involved in this appeal, although a different record is presented.

The deceased was a Belgian by birth. He came to this country in 1892 with his eight children. He engaged in truck farming in the suburbs of Detroit. He was without education but was intelligent, industrious and saving. The wife took care of the business end until 1909, when she died. The oldest boy, Henry, succeeded his mother in transacting his

father's business until the year 1913, when the deceased revoked the power of attorney to Henry and took his business matters into his own hands.   During several years the savings had been invested in Detroit real estate.    In 1913 he had six houses which he rented.    When the deceased revoked Henry's power of attorney, Henry, for a time, refused to surrender his papers.    Later he did so and then made an application to the probate court for the appointment of a guardian for his father.    The deceased did not appear and a guardian was appointed.    Later the deceased filed a motion, by counsel, to re-open the proceeding.    This motion was granted, and after hearing the testimony of the deceased the guardianship proceedings were dismissed by the probate court. All of his children were present in court to testify against him.

After the death of his wife the testator lived for a time with some of his children.    Afterwards he lived with strangers for a time.    After the attempt to place a guardian over him he drifted away from his children.    Finally he began housekeeping in one of his own houses and, in September, 1913, installed as housekeeper therein Miss Louise Billiet, a Belgian woman, who came to this country in 1912.   She was about 40 years of age and was an aunt of his deceased wife.    She kept testator's house and aided him in his business for nearly five years before his death.

In April, 1914, a few months after the guardianship proceedings were dismissed, he went to Mr. Powell, a reputable attorney, of Detroit, and had him draft a will for him, in which he gave the bulk of his estate to proponent.    In June, 1917, he made the present will.    This will is as follows:

"I, Matheus VerVaecke, of the city of Detroit, coun-

ty of Wayne and State of Michigan, do hereby make, publish and declare this my last will and testament, in manner and form following:

"*First.* I direct that all my just debts and funeral expenses be paid as soon after my decease as conveniently can be done.

"*Second.* I give, devise and bequeath to my housekeeper, Louise Billiet, all my household furniture and the following described real estate situated and being in the city of Detroit, county of Wayne and State of Michigan, to wit:

"Lot numbered six (6) of Everding's subdivision of lot A of the subdivision of lots twenty-two (22) and twenty-three (23) of private claim 723 as recorded in liber 13 of plats at page 53, Wayne county records, also,

"Lot numbered seven (7) of Everding's subdivision of lot A of the subdivision of lots twenty-two (22) and twenty-three (23) of private claim 723, according to the recorded plat thereof in liber 13 of plats on page 53, Wayne county registry; also,

"All those pieces or parcels of land situate and being in the city of Detroit, county of Wayne and State of Michigan, and described as follows, to-wit: Lots numbered fifty (50) and fifty-one (51) of Barnart and Fisher's subdivision of lots twenty-two (22) and twenty-three (23) of the subdivision of the west part of private claim 723, according to the plat of said subdivision recorded in the register of deeds' office for said Wayne county, in liber 10 of plats on page 27.

"*Third.* I give, devise and bequeath one-eighth ($\frac{1}{8}$) part of the remainder of my estate to the children of my deceased daughter, Pharilde Warnez, share and share alike.

"*Fourth.* I give, devise and bequeath all the rest, residue and remainder of my estate, real, personal and mixed wheresoever situated of which I may die seized, or possessed, or to which I may be entitled at the time of my death, to my seven children Camille VerVaecke, Emile VerVaecke, Emma Warnez, Henry VerVaecke, Rene VerVaecke, August VerVaecke, and Adele Cools, share and share alike.

"*Fifth.* I will that the expense of my last illness and funeral expenses shall be paid from the property

devised to said Louise Billiet, and I hereby authorize my executor hereinafter named to mortgage or sell so much of said property mentioned in paragraph two, as may be necessary to defray such expenses.

"*Sixth.* I will that ten (10) dollars shall also be taken out of the devise herein made to Louise Billiet for masses for the repose of the soul of my deceased wife and myself.

"*Seventh.* I nominate, constitute and appoint Henry Huvoere of Grosse Pointe Park, Wayne county, Michigan, executor of this my last will and testament.

"*Eighth.* I hereby revoke all former wills and testamentary dispositions by me heretofore made.

"In witness whereof, I, the said Matheus VerVaecke, have hereunto subscribed my name this 20th day of June in the year of our Lord one thousand nine hundred and seventeen.

"MATHEUS VERVAECKE (L. S.)"

The inventory filed in probate court by Henry in July, 1913, showed the estate to be worth between $13,000 and $14,000.

Mental Incompetency.   In April, 1914, a few months after the guardianship proceedings had been dismissed, the testator went to Mr. Powell and requested him to prepare his will.   At testator's request, Mr. Huvoere, an old friend and one of his countrymen, who understood and spoke better English than he, accompanied him.   Testator directed Mr. Powell how he wanted to distribute his real estate, without aid or suggestion from anyone, and furnished him the specific descriptions of the several parcels which he owned.   The 1917, or present will, divided the property in the same proportions that the 1914 did.   The only change that was made in the will of 1917 was with reference to property which he had given to a daughter, who was since deceased.   In view of this, we may conclude that he made the division of property between proponent and his children in 1914.   At that date was he mentally in-

competent? There is no proof that testator was mentally incompetent to make the 1914 will. No one of his seven children testified that he was mentally incompetent to execute it. Nor did any of them testify that he was mentally incompetent to execute the 1917 will. They did testify to things he had said and done about the year 1917 and later, but these consisted of instances of forgetfulness and growing physical infirmity which overtakes the average man as he enters the zone of old age. And, indeed, they were not well qualified to speak of his condition, as none of them visited him but a few times in the five years following the guardianship proceedings.

It is urged that the testimony of Henry Van-Slembrouck, an old friend, is evidence of mental incompetency because he refused to make the 1914 will, on the ground that he did not think testator knew what he was doing. The testator went to Van-Slembrouck soon after the probate court discharged his guardian, and requested him to draw the will, because he spoke the same language and could understand him. After the testator had told him what division of his property he wanted to make Van-Slembrouck objected to drawing the will because it would be too complicated, and advised him he had better see an attorney. VanSlembrouck was acquainted with the whole family and, doubtless, his real reason was that he was afraid that such a will would create trouble in the family. VanSlembrouck did not testify that testator was incompetent, or that he was unduly influenced, neither did he testify to any facts from which either condition could be inferred by the jury. The following bit of testimony will show why he did not care to prepare the will:

"Q. Will you tell me whether he stated how much or what he wanted to give his housekeeper?

"A. Well, as far as he went, the plain statement

that he made to me at that time that he wanted to provide her with a roof over her head when he was dead.    He said it in Flemish.

"Q. And what did you say to him?

"A. Well, I told him, after we talked the matter over, that in view of the fact that it would be complicated, and, in addition thereto, the way he explained it, that he wanted to take so much away from his children, I told him I did not care to draw up the will.    I says: 'It is something out of the ordinary and for that reason I would not want to do it.'    I says: 'You had better consult some attorney who may not be so intimately acquainted with you as I am, and with the children.' "

This witness had known the testator for many years and had done business for him, and during his later life had lived near him, and it is to be assumed, as he was a witness for contestants, that, had he regarded the testator as incompetent to make the will in question, he would have said so.

On the other hand lawyers with whom testator had done business, Dr. Hart who had treated him, numerous tenants who had rented his houses, several neighbors who saw him daily, and many business and social friends testified that he was a smart and industrious old gentleman.    That he had some difficulty in transacting business because he spoke and understood English so imperfectly.    Many of these witnesses explained how he had gone ahead after 1913 and improved his properties.

When a man goes to an attorney, and, without aid or suggestion, directs the provisions of his will, and furnishes specific descriptions of all the property he owns, it is a waste of time to discuss the question as to whether he was mentally competent to dispose of his property as he did.    *In re Dowell's Estate,* 152 Mich. 194.    In this case it was said:

"It is said error was committed in refusing to

submit the case to the jury on either the theory of undue influence or want of mental capacity. The testimony is undisputed that Mr. Dowell went to the scrivener alone and gave him directions as to what he wanted done. He also went alone and got an old acquaintance of his to go to the scrivener to act as a witness. We have had occasion recently to discuss the question of testamentary capacity and the question of undue influence in *Leffingwell* v. *Bettinghouse*, 151 Mich. 513. It is not necessary to repeat here what was said in that case. We shall content ourselves by saying there was nothing to show want of testamentary capacity, nor was there anything to show undue influence." See, also, *Spratt* v. *Spratt*, 76 Mich. 384; *In re Walz's Estate*, 215 Mich. 118.

And especially is this rule true if, before and afterward, the testator actually looks after and manages his business matters, and the estate increases in value under his management. From 1913 to 1917 he improved his houses, built new ones, constructed cellars, sewers and cement sidewalks, and, as a result of this, his monthly rentals increased from $97 in 1913 to $325 a month after the changes and improvements were made. When the testator was nearing his end he was asked if he desired to make any changes in his will and he expressed himself as being satisfied with it the way it was. We think there was no competent proof to submit to the jury on this question.

Undue Influence. The question of undue influence centers around the acts and conduct of the proponent. The suspicion is overworked that because proponent had an opportunity to overcome the will of testator with reference to his property matters that she did so. Opportunity alone is not sufficient to raise an inference of this character. *In re Williams' Estate*, 185 Mich. 97; *In re Fay's Estate*, 197 Mich. 675; *Blackman* v. *Andrews*, 150 Mich. 322; *In re Carlson's Estate*, 218 Mich. 262.

The case is bald of any testimony that testator was

unduly influenced to give proponent the bulk of his
property before he made the will of 1914.    Attempts
were made by the children to show that she was un-
friendly to them and that she did not want them to
visit their father, but no one testified to any word or
conduct directly from her which would tend to support
this claim.    Some of the children testified that their
father said proponent did not want them to come to
the house, but this was not until long after the 1914
will was made.    There is no proof that she knew
what the provisions of the will were, or that she ever
tried to influence him to give her the property, either
before the 1914 will was made, or at any other time.

Proponent says she went to work as a clerk in a
store where testator bought tobacco, etc.; that she used
to talk with him when he came in; that testator spoke
to her on several occasions about keeping house for
him.    Finally he said to her that his income at that
time was so small he could not pay her large wages
but if she would come and keep his house and help
him with his business matters he would take good care
of her after he was dead.    To this she finally con-
sented and went to work for him.    The record shows
she was faithful to her trust.    She not only kept
testator's house, but assisted him in improving his
properties.    She worked with testator, shingling a
roof.    She helped him dig a cellar and a sewer, she
cleaned and renovated the houses when they were
vacated, and when the testator grew weaker at the
last she looked after the furnace fires.    That testator
appreciated his home and proponent's interest and
help in his work is evidenced by numerous expressions
to his friends.

The testator made many complaints because his
children attempted to put a guardian over him.    This
act appeared to embitter him and this condition of

mind seemed to increase because they did not visit him. He advised one friend to have no more children, as they would only bring him trouble. The 1914 will was made in April, only a few months after the guardianship proceedings were dismissed, and while he was yet smarting under its sting. At this time proponent had been with him only a few months. It would be difficult for one to read the record without being persuaded that testator deprived his children of the bulk of his property because of their attempt to put a guardian over him. The inference is equally strong that he gave it to proponent because she was making a home for him, helping to make life pleasant for him, and helping to increase his income, and there is no proof that she secured it by unfair means.

The whole record is persuasive that this is another instance, not uncommon in these days, of children reaching for the estate of the parents before they have finished with it. If, by reason of their greed and anxiety, the contestants were led to force matters so fast that it angered their father, and thereby they have lost what otherwise would have been theirs, they have no one to blame but themselves.

It is not difficult to understand why two juries have taken the position they have in a case of this kind. But it must be remembered that it is not the business or duty of courts and juries to make wills for people. Even though it be conceded that testator's division of his property was an unwise one, we have no right to interfere if it were done by him freely, and he was mentally competent when he did it.

The judgment for contestants must be set aside and one entered in the circuit court sustaining the will.

WIEST, C. J., and FELLOWS, McDONALD, CLARK, and STEERE, JJ., concurred with BIRD, J. MOORE, J., did not sit.

SHARPE, J. (*dissenting*). I cannot agree with the conclusion reached by Mr. Justice BIRD that there was no evidence of either mental incapacity or undue influence to submit to the jury. The evidence is certainly no more favorable to proponent, in fact, I think it is less so, than on the former trial. We then held that there was competent proof to carry both the question of incompetency and undue influence to the jury. It seems to me that in considering this evidence undue weight is attached to the trouble which deceased had with certain of his children. A little of the family history is instructive. As stated in the former opinion:

"His wife was the active manager of their business affairs on account of his being illiterate and not familiar with the English language."

It may also be said that her management was due to her superior business intelligence. She rented the farm when they moved on it. She negotiated the purchase of the lots in Detroit. The work on the buildings erected on them was largely done by the sons, except Henry, who was married and had a home of his own. When they moved into Detroit in 1907, the mother attended to all business matters, collected the rentals, paid the interest and taxes and provided for the home. After her death in 1909, a daughter, Adele, then 20 years old, took charge of such matters at her father's request. She opened a bank account in his name. There is testimony that the father at this time was drinking intoxicating liquors somewhat to excess and that the children were concerned about it. At a family meeting at which all were present, he requested the eldest son, Henry, to take charge of his business affairs. In September, 1909, he executed a power of attorney to Henry, authorizing him to do so. No friction developed until

the spring of 1912, when the deceased first met the proponent in Detroit soon after her arrival from Belgium. She was an aunt of his late wife. She was then about 40 years of age and unmarried. He saw her frequently at parties and at the place where she was working and became fond of her. His son August and his wife were then living with him in his home. He expressed dissatisfaction about his meals and treatment generally and in June left his home and went to live with Mr. Van Derplanke. In the summer of 1912, he visited Belgium. On his return he lived with his son Camille for some months. At his request Henry got the tenant of one of his houses to vacate and he went there to live. His close association with proponent was continued. In the spring of 1913 he demanded the return of his power of attorney and papers. Henry filed a petition for and was appointed guardian of his father. Deceased soon after made application to vacate this order and such action was had on August 26th, there having been no opposition thereto. Proponent admits that deceased first spoke to her about working for him in the spring of 1913 "because he said that his children were not good to him and he wants somebody to take care of him;" that for a few months she worked for him mornings and evenings, staying at his home nights, and about September 1st she began keeping house for him at 349 Fisher avenue, which he owned. It was a single house, with seven rooms, all the sleeping rooms being upstairs.

These occurrences and their dates are to me very significant. The deceased was apparently content to permit Henry to continue looking after his business affairs until his intimacy with proponent had developed to the extent that she was doing his work for him and as soon as he had regained the control of his

property she went to live with him. The first will was made in April, 1914, about seven months thereafter. It is said that he was annoyed because his children did not more frequently visit him thereafter. We think no explanation was needed as to why they did not do so, but, if so, it is given in what his old friend, Mr. VanSlembrouck, said to him, hereinafter quoted. His eldest daughter, Emma Warnez, also testified that he said to her:

"Louise don't care much for youse, and you better not come. Whenever I want to see you I come and see you myself."

Stress is laid upon the fact that his properties were greatly improved after 1914 and the rental values thereof much increased. It is apparent that proponent superintended such work. Several who did work on the properties testified that she made the arrangements therefor, and I think it may fairly be said from the record that she took Henry's place as the manager of his business affairs. She testified that he wanted her—

"to take care of his business and take care of making his meals and attend to all what have to be done."

That she was an able, competent, business woman, there can be no doubt. She had been engaged in the creamery business with one of her sisters for six years before coming to Detroit. She opened a bank account in January, 1914, in her own name and deposited the money of the deceased as well as her own in it. Her reason for doing so is thus stated by her:

"Because he did not want no bank account; he did not want to bother him to go up and down to the bank and he said he wanted me to put it in my bank book, to go myself to draw it out when we needed it."

In answer to questions concerning particular deposits she said:

"I deposited the money when we got too much money and kept it for to pay bills."

At his death there was to her credit in the bank $305.73. She testified it was all hers and that he also owed her money at that time. She held his note for $1,200, executed on May 15, 1916.

These facts, and I think it may be said that they are undisputed, were all placed before the jury, and the testimony submitted as to the mental competency of the deceased at the time he executed the will in question and the undue influence exercised over him by proponent in procuring its execution was considered by them with such facts in mind.

The will practically disinherited all his children, most of whom had contributed largely of their time after attaining their majority to the acquisition of his property, as will hereafter be pointed out. That he had no reason for doing so prior to the time when he came under the influence of proponent is clearly apparent. That she was kind to him, looked after his affairs and rendered him valuable service also admits of no doubt. But that, if mentally competent and free from undue influence, he would have recompensed her by bestowing upon her substantially all of his property, worth, as stated by Mr. Justice BIRD, between $13,000 and $14,000 (there is proof that its value was much greater), may well be doubted.

Let us now examine the proofs, bearing in mind the familiar rule that when a motion is made for a directed verdict it must be viewed in the light most favorable to the other party. The length of this opinion precludes but a few quotations from it, all of which was admitted without objection.

Paul DeBeake, also a Belgian, lived quite near to deceased the last few years of his life. He testified that deceased had a couch in the basement of the four-

family flat in which he lived and he saw him there three or four times a week. On being asked what deceased was doing in the basement, he answered:

"Well, he would keep that furnace going, and he would lay down. He was kind of sickly and feeble; if I went down to talk to him often I could only speak a word or two; he wanted me to go away like he was feeble and childish like; you could not get no conversation for the last couple of years, it was wonderful, I pity the old man."

He further testified:

"Q. Will you state whether or not he ever talked about Henry?

"A. Oh, yes, often, he always talked ever since he came over from the old country; he think the world about Henry and his children all of them; it would be Henry, Henry did lots of work for him and the children worked hard for him, all the time, and was nice to him.

"Q. Will you state whether or not during the last couple of years of his life he was always able to understand you when you talked to him?

"A. Well, yes, he could understand some words if you talk to him, you know, and sometimes he act like if he don't care about talking to you, you know, he was sickly, you know, and feeble-like.

"Q. And what kind of answers did he make to what you said to him sometimes; were they sensible answers or not?

"A. Well, he can't hardly answer, like you talk about the work, if you meet a man like that, childish, you ain't going to answer him no questions to bother him about anything; you know, because he was feeble and childish like for the last two years, you could get no conversation from him at all. * * *

"Q. Well, he used to come over there and you always used to play cards together at the place you spoke of?

"A. Yes, that is for the last two years he did not play no more cards; he could not hold them in his hands.

223—Mich.—28.

"*Q.* His hands trembled a little bit?

"*A.* Yes, and he could not count; he could not keep track no more.

"*Q.* Did he complain to you about his children never coming to see him?

"*A.* He never say nothing around about his children; of course, he told me that Louise don't want his children around there; he always told me not to say anything because he 'got to live with her and she don't want them."

Elizabeth Wayoff, who occupied a part of the house in which deceased lived, moving in about the time the last will was made, and who could speak the Flemish language, testified:

"*Q.* And what, if anything, have you seen him doing?

"*A.* Well, I seen him often working down in the basement and I seen him often crying down there too.

"*Q.* Will you state whether or not anything had happened at or about the time you saw him crying in the basement?

"*A.* It was mostly after he had an argument, or I don't know if it was an argument, or a loud talk with this lady, with Miss Billiet.

"*Q.* With—loud talking with Miss Billiet?

"*A.* Yes.

"*Q.* Will you state whether or not you recognized the character, or anything of the nature of the remarks she made to him on these occasions?

"*A.* Well, I thought she was quarreling with him, and she swore at him often and then slammed the door and left him alone.

"*Q.* And it was after she swore at him that he would cry?

"*A.* Yes.

"*Q.* About how many occasions would you say you have seen him crying in the basement?

"*A.* Oh, well, I don't know, I guess about four or five times in the time that I was over there.

"*Q.* Did you talk to him when you saw him crying there?

"*A.* Yes, I did.

"*Q.* And what did you say to him?

"*A.* I went down and my husband did, too, and we asked him if we could do something for him, and he said 'no,' he wanted to be left alone."

She also testified that deceased used to work at night in the basement and that on two occasions she saw him making cement sidewalks about 1 or 2 o'clock in the morning; that she spoke to proponent about it:

"*Q.* And what did she say?

"*A.* She told me not to mind him because the old gentleman was half of the time out of his mind; he did not know what he was doing.

"*Q.* Did she say anything else about him?

"*A.* Well, she said: 'You see he is out of his mind because he got lost once in a while and not long ago a policeman had to bring him home.' "

And as to another occasion:

"Well, my husband and I, we went to pay the rent and she was sitting rather close to him.

"*Q.* To the old gentleman?

"*A.* Yes, and when she came up to the house my husband made the remark and asked her; he said: 'Well, there must be something more about it than being a housekeeper for him,' and she said: 'No, don't you believe it, there is nothing to it, I am just a plain housekeeper to him; I get good pay for him and I have a good home.'

"*Q.* She said she got good pay for it?

"*A.* Yes, she said even how much she got.

"*Q.* How much did she say she got?

"*A.* $30 a month.

"*Q.* How much?

"*A.* $30 a month.

"*Q.* $30 a month. Will you state whether or not the old gentleman ever did anything else unusual that you have not told us about?

"*A.* I don't know, besides working in the basement nights, he often came and brought his cat along and talked to his cat for an hour or so.

"*Mr. Bowles:* His what?

"*Q.* To his cat?

"*A.* Yes, his cat.

"*Q.* He talked to his cat for an hour or so?

"*A.* Yes, right under our bedroom."

August Ver Vaecke, the youngest son of deceased and with whom his relations had apparently always been pleasant, testified that once he met his father in a saloon and—

"Father told me, he says: 'You don't know what I am here for?' I says: 'What is the matter now?' 'Why,' he says, 'Louise has always been bothering me now for the last few weeks for making a will and I ran away from her.' That was the fore part of June, 1917. I met him once before at the corner of Sheridan and Kercheval.

"*Q.* What was said between you and he at this place at Sheridan and Kercheval?

"*A.* Why, he says that Louise always was after him, that she wanted to get married to him. He said he would not marry another woman on a bet.

"*Q.* Will you state what he said, if anything, as to what she wanted in addition to marrying him?

"*A.* He said that she wanted all the property when she married him."

He further testified that on one occasion he saw his father at his home. Proponent was present.

"*A.* Louise says, in the presence of me and my father: 'Yes, he is getting rather childish, I have got to be watching him wherever he goes; he will say he will go over there and he will go down in the basement.'

"*Q.* Did your father say anything or make any objection to that statement?

"*A.* No."

Albert Oliver, an electrical contractor, testified that he did some work in the houses owned by deceased in the spring of 1917; that proponent always made the arrangements with him and paid him for the work done, although deceased was present at times; that

after the death of deceased proponent asked him "to make some receipts over again, I think, in Mr. Ver Vaecke's name;" and that he told her he "could not do it."

Henry B. VanSlembrouck, a compatriot of the deceased, who had lived in Detroit for 25 years, having been deputy county clerk, deputy county treasurer, deputy sheriff, and for six years Belgian vice-consul in Detroit, a friend of the deceased for many years and a personal friend of the proponent, testified that deceased came to him several times in 1913 and 1914 and asked him to prepare his will; that he declined to do so for the reason, among others:

"I stated to him that on account of his advanced age and the peculiar circumstances under which he was living, that I would not feel justified to draw the will because I did not think that he realized what he was doing."

In view of this testimony, and there is much other of the same character, I do not think it can be said, as a matter of law, that there was no evidence to submit to the jury on the question of the mental incompetency of the deceased or the undue influence exercised over him by the proponent.    She accompanied deceased to Mr. Powell's office at the time the will in question was drawn.    It appears, however, that she was not in the room with them when it was prepared or executed.

It is admitted that the only property which passed to his children under the residuary clause in the third paragraph was the Van Dyke avenue property.    The only testimony I find as to its value fixed it at $6,000. This bequest alone was subject to any indebtedness he had, not specified in the will itself.    The bequests to proponent were specific.    The testimony shows that at the time of his death proponent held his unsecured note in the sum of $1,200; that he was in-

debted to the American State Bank in the sum of $600, to Robert Trombley in the sum of $1,500, and to Mrs. Robert Trombley in the sum of $2,700. The bequest to his children therefore carried nothing of value.

When properly presented, it is our duty under the statute to examine the proof submitted and, if we find the verdict to be contrary to the great weight of the evidence, to order a new trial. Two juries have decided in contestants' favor. Two trial judges have denied motions for new trials, based on the claim that the verdicts were against the weight of the evidence. These juries and judges saw the witnesses and heard them testify. In stating his reasons for denying the motion, Judge Webster said, in part:

"Twenty-four men have now decided in favor of the contestants and two circuit judges have decided that the verdict of the two juries was not against the weight of evidence. I believe there is a vast difference between reading testimony in cold type and seeing witnesses upon the witness stand and hearing them testify, being able to observe their features, their demeanor and conduct upon the stand you are bound to get a different and a better impression and one more near the truth than you could possibly get by sitting afterwards some distance away and reading in cold type what that witness said. You have then before you nothing but the plain language. You have not the witness, the witness' face, features, conduct and demeanor upon the stand, and many other various little things that happen as a witness is testifying by which you may decide whether or not the witness is testifying to the truth. It is impossible to put those things in print and some of them it would be impossible even to describe, because I think it has been the experience of all of us that sometimes there is something about a witness while testifying from which you decide whether or not that witness is telling the truth and that sometimes, I say, that 'something' is not even describable. For instance, the Supreme

Court says that the testimony, reciting certain parts of it, shows that he (the testator) had been wronged by his children. I gain no such impression. My impression is entirely the opposite and, as I say, I have the advantage in having seen all of these witnesses and heard them testifying and watched them while they were testifying. I am satisfied that these children did not wrong their father and never had any intention of wronging him. On the other hand, I am satisfied that he had a delusion upon this point. He justified his own conduct by blaming his children. This is quite usual under similar circumstances. When a woman comes into a man's life, especially at his age, and who has lost his first wife, and who has children, and there is some feeling between the children and the new woman, it is quite ordinary and customary for the man, in order to justify himself for his conduct in reference to the new woman, to blame the entire situation upon the children. When this plaintiff got this hold over the testator that she evidently did get, the children were helpless. There was nothing they could do and they did not know what to do to stop it. In fact experience has shown there is no way to stop it when an old man of his age becomes infatuated with a new woman, after losing his wife, there is nothing the children can do, they might as well give up.

"I am satisfied this plaintiff was the cause of all the trouble and the reason for his condition of mind and the feeling that he had toward his children and his action in making this will. I am satisfied of all this from the testimony and from the action and demeanor and conduct of the various witnesses upon the stand while giving that testimony."

The conclusions reached by these judges should have much weight. Satisfied, as I am, and as we before held, that the proponent was not entitled to a directed verdict, I am persuaded that the case should not go back for a new trial.

The judgment should be affirmed.