## *In re* AYLWARD'S ESTATE.

1. WILLS—MENTAL COMPETENCY — EFFECT OF TESTIMONY OF LAY WITNESSES.

> Where testatrix was very old when she made her will, and had suffered considerable physical impairment, with some incidental mental loss, testimony by lay witnesses that she was irritable, that she made complaints of fancied inattention and deprivation, that she insisted on a peculiar arrangement of her feather bed, that she fell out .of it several times, that she was fussy about her dress, that she was sometimes untidy, that she was forgetful, that she failed to exhaust subjects of conversation, and sometimes did   not   readily   recognize   persons,   *held*,   insufficient to

On the general rules for determining testamentary capacity to make will, see annotation in 27 L. R. A. (N. S.) 1; L. R. A. 1915A, 444; 28 R. C. L. 86; 4 R. C. L. Supp. 1799; 6 R. C. L. Supp. 1703.

raise a question for the jury as to her mental competency to make the will, where there was positive testimony that she dictated its provisions, and that, both before and after its making, she conducted her own business, making the necessary instruments of conveyance without her competency to do so being challenged by any one.

2. SAME — EXPERT OPINION EVIDENCE OF INCOMPETENCY OF NO WEIGHT AGAINST POSITIVE UNCONTRADICTED TESTIMONY OF COMPETENCY.

Expert medical testimony that testatrix was not competent to make a will at the time she made it, whether in answer to hypothetical questions or based on observations of testatrix made months before the will was made, is opinion evidence merely, and, as against the otherwise uncontroverted testimony that testatrix actually dictated her will, and that she alone directed the forming of each of its provisions, is entitled to be given no weight whatever.

3. SAME—RULE AS TO EXTENT OF MENTAL COMPETENCY NECESSARY TO MAKE WILL.

If testatrix, at the time she executed the will, had sufficient mental capacity to understand the business in which she was engaged, to know and understand the extent and value of her property, and how she wanted to dispose of it, and to keep these facts in mind long enough to dictate her will without prompting from others, she had sufficient capacity to make the will.

4. SAME—VALID WILL MAY BE EXECUTED ALTHOUGH MAKER SOMEWHAT AFFECTED BY MENTAL DISEASE.

A testator may be suffering physical ills and some degree of mental disease and still execute a valid will, unless the provisions thereof are affected thereby.

Error to Wayne; Cross (Orien S.), J., presiding. Submitted April 24, 1928. (Docket No. 18, Calendar No. 33,091.) Decided June 4, 1928. Rehearing denied October 1, 1928.

Elizabeth Aylward presented for probate the last will of Mary Aylward, deceased. On petition of Helen Aylward Luycks the will was certified to the circuit court. Judgment for contestant. Proponent brings

error.    Reversed, and judgment ordered entered for proponent.

*Atkinson, O'Brien & Clark* (*Frank W. Atkinson* and *William F. Connolly,* of counsel), for appellant.

*Frank A. Martin, Henry C. L. Forler,* and *Frederic T. Harward,* for appellee.

CLARK, J.    The will of Mary Aylward is contested by her granddaughter Helen Aylward Luycks.    In the trial the grounds of contest were mental incompetency and undue influence.    After the arguments and before the charge the question of undue influence was withdrawn by counsel for the contestants.    On the sole ground of mental incompetency the verdict was against the will.    Judgment was entered on the verdict, and the proponent, Elizabeth Aylward, only surviving child of the testatrix, brings error.

The decisive question is that verdict for the will ought to have been directed.    Testatrix was born in Cork, Ireland, in 1832.    She married Lawrence Aylward in Detroit in 1857.    Two sons and three daughters were the result of the union.    The oldest son, Edward, left home at an early age, married, was the father of contestant, the only grandchild of testatrix.    The daughters Elizabeth, Mary, and Frances did not marry.    They became school teachers.    Mary taught until Frances died in 1920, and then remained at home until her own death in March, 1922.    Elizabeth taught until June, 1922, and thereafter remained at home because of her mother's poor health.    Richard did not marry.    He lived at home.    When a boy he peddled papers and worked when not in school. He became a clerk in a coal office.    Having saved $600, and getting a like amount from Mary and Elizabeth, he ventured into the coal business and succeeded, aided by his longtime employee and associate

and friend, Harold King.    The expenses of the home, of which testatrix was the head, were paid out of earnings of the daughters and of Richard.    Richard died in February, 1922.

Upon the death of Mary and Frances, their properties, valued at nearly $100,000, passed to the mother, and Richard's estate, valued at nearly $360,000, also went to her.    The interest, which had been Richard's, in the personal property of the coal business, valued at nearly $60,000, was turned over to Elizabeth, who combined on an equal basis such interest with that of King and organized a corporation to continue the coal business under the management of King.    This was done under the advice of testatrix's counsel, Judge P. J. M. Hally, and it seems to have been a wise and profitable arrangement.    The mother also conveyed some real estate to Elizabeth.

Practically all of testatrix's estate came from her children, as stated, and it may be said to have been produced by the combined efforts of the mother, the three daughters, and Richard.    The son Edward contributed nothing.    Rather he and the contestant were beneficiaries of the bounty of the others.    Edward died in 1911.    His widow married again in 1915. Contestant married in the fall of 1922.

Testatrix's arteries were very hard.    She was treated for varicose ulcer in 1921.    In July, 1922, she had what is called a slight stroke and was unconscious for two or three days, from which she made satisfactory recovery.    In her late years she was somewhat deaf.    She could not write.    She was devoutly religious.    Judge Hally said "Mrs. Aylward would talk with you, but she was not loquacious."    Another witness said:

"She was a very determined woman, set in her ways, obstinate to anybody trying to show their point of view, affectionate to her children, but did not take outsiders into her confidence.    She kept her affairs to

herself and was a woman you might describe as close-mouthed and reticent. She was not very much of a talker, but when she said yes she meant it. She was not inclined to gossip at all. She was a woman capable of making up her own mind, and in my experience of her she did make up her own mind on various occasions, and when she had made her mind up she was quite obstinate in keeping her opinions."

The will was made on November 14, 1922, when testatrix was very old, when she had suffered considerable physical impairment, and, it cannot be doubted, some incidental mental loss. She wanted Judge Hally to prepare the will, but he was out of the city, so Mr. King was called. He went to her room and took notes of testatrix's directions, put the will in form and it was duly executed. Unless the opinions of some witnesses may be held to controvert it, it is undisputed that each and every provision of the will was dictated by testatrix herself without suggestion from any one. The will:

"Detroit, Mich., Nov. 14, 1922.

"Last will and testament of Mary Aylward of Detroit, Mich., made at Detroit, Mich., this 14th day of November, 1922, which hereby revokes any and every will made by me heretofore.

"After the payment of my funeral expenses and any and all other just expenses, and being of sound mind and memory, I hereby give and devise my property, real and personal, as follows:

"To St. Vincent's Catholic Orphan Asylum, of Detroit, Mich., the sum of five hundred dollars ($500.00).

"To the Little Sisters of the Poor, of Detroit, Mich., the sum of five hundred dollars ($500.00).

"To Rev. Fr. Higgins of St. Charles Church, Detroit, Mich., the sum of two hundred fifty dollars ($250.00).

"To Rev. Thos. Carey of St. Johns, Mich., the sum of two hundred fifty dollars ($250.00).

"To Elizabeth Welch, of Detroit, Mich., the sum of two hundred fifty dollars ($250.00).

"To Edward Welch, of Detroit, Mich., the sum of five hundred dollars ($500.00).

"To my nephew, John Crowley of Taylor Center, Mich., the sum of one thousand dollars ($1,000.00).

"To Mrs. Mary Clancy, of Detroit, Mich., the sum of five hundred dollars ($500.00).

"To Mrs. Mary Scullen, of Detroit, Mich., the sum of five hundred dollars ($500.00).

"To St. Charles Church, of Detroit, Mich., for masses for myself and my family, the sum of five hundred dollars ($500.00).

"To my granddaughter, Helen F. Aylward, the sum of fifty thousand dollars ($50,000.00).

"The balance of my estate, real and personal, of any and every nature, moneys, stocks, bonds, etc., I hereby give and bequeath to my daughter, Elizabeth Aylward, of Detroit, Mich., whom I also appoint executrix of my estate."

One of the witnesses to the will is Arthur W. Beckley, an old friend of the family, who happened to be in the Aylward home at the time. The other subscribing witness is Peter L. Holmes, the family chauffer, who later left the service with reduction in pay, and seemingly was hostile. He had the opinion that the will ought to have been read to him as a necessary prerequisite to validity. From his observation while in the employ he testified of testatrix's acts, conduct, and appearance, and expressed his opinion against her mental competency, saying, however, that testatrix, at the time of signing the will, stated that she understood it. A number of lay witnesses for contestant testified of testatrix's being irritable, of her making complaints of fancied inattention and deprivation, that she insisted on a peculiar arrangement of her feather bed, that she fell out of it several times in several months, that she was fussy about her dresses, and sometimes untidy, that she was forgetful, that she failed to exhaust subjects of conversation, and sometimes did not readily recognize persons. It is said, too, that she often mumbled aloud, but it appears that she was deaf and that she said her beads audibly,

This is sufficient characterization of the testimony of the lay witnesses against the will.

Two medical witnesses gave opinions against the will in response to usual hypothetical questions. A physician treated testatrix in 1921 for varicose ulcer. He testified that he thought her a case of senile dementia—"a rather progressive disease," that sometimes she did not appear to recognize him, was apparently of short memory, and

"*Q.* Could she carry on a connected conversation with you at that time?

"*A.* Not very much; very little.

"*Q.* Were her answers responsive to your questions?

"*A.* Well, the short answers were, but not extensively."

In March, 1922, this physician and another were treating testatrix's daughter, and went to testatrix to tell her that the daughter's illness was to result fatally. They testified that in their opinion they did not get the message across, that she did not appear to understand. They did not examine her. Both these physicians from such experience and observation and without again seeing testatrix, testified of the opinion that testatrix at the time of making the will was not competent to make it. Proponent adduced abundant evidence that testatrix was mentally competent; the testimony of Judge Hally is especially convincing.

If this old lady is to be denied by the courts the right to dispose of her own property as she saw fit, the right to remember her favored pastors, charities, relatives, and friends, and the right to seek for herself and her children the sanctuary of her faith, some substantial reason requiring it must be found. The will itself suggests no mental incompetency. It is the reasonable outgrowth of her life, devoted to her religion and to her children. It was both natural and reasonable on the facts disclosed that testatrix

should prefer her sole surviving child above all others.

No one in testatrix's lifetime challenged her right or her competency to make instruments of conveyance, as she did both before and after the making of the will.

The testimony of lay witnesses for contestants under many decisions of this court which need not be quoted from made no issue of fact respecting mental incompetency. They testified to nothing inconsistent with testatrix's competency to make the will. See *In re Murray's Estate*, 219 Mich. 70; *In re Littlejohn's Estate*, 239 Mich. 630, and cases cited.

The medical testimony for contestant, whether in answer to hypothetical questions or based on observation of testatrix months before the will was made, to the effect that testatrix was not competent to make the will at the time she did make it, is opinion evidence merely. What weight shall be given such opinions as against the otherwise uncontroverted testimony that testatrix actually dictated her will, that she alone directed the forming of each and every of its provisions? No weight, according to the cases. In *Spratt* v. *Spratt*, 76 Mich. 384, frequently cited and approved, the following questions were answered as above answered:

"But what weight is opinion evidence entitled to where it appears that, unaided by any one, he does in fact make a will disposing of all his property, dictating consecutively the bequests and devises he sees fit to make to a large number of relatives, near and remote? What weight or reliance should be given to the opinion of persons, interested or disinterested, professional or lay, to the effect that a person, who has in fact dictated a will disposing of all his property by successive bequests and devises, requiring consecutive thought and the exercise of memory, was unable to transact any matter of business which required for its completion several hours of time, recalling of various people and facts, or that he was mentally in-

capacitated to understand the nature and extent of his property, and the number and relation of those who were the proper objects of his bounty, so as to make a will devising his estate?"

In *Re Ver Vaecke's Estate,* 223 Mich. 419, it was said:

"When a man goes to an attorney, and, without aid or suggestion, directs the provisions of his will, and furnishes specific descriptions of all the property he owns, it is a waste of time to discuss the question as to whether he was mentally competent to dispose of his property as he did."

See, also, *In re Littlejohn's Estate, supra,* and cases cited.

The rule as to mental competency to make a will according to *In re Ferguson's Estate,* 239 Mich. 616, is that if testatrix,—

"at the time she executed the will, had sufficient mental capacity to understand the business in which she was engaged, to know and understand the extent and value of her property, and how she wanted to dispose of it, and to keep these facts in her mind long enough to dictate her will without prompting from others, she had sufficient capacity to make the will. A testator may be suffering physical ills and some degree of mental disease and still execute a valid will, unless the provisions thereof are affected thereby."

Probably testatrix at the time of making the will could not have recited a detailed inventory of all her possessions. But she knew in a broad and general sense what she had. The will itself shows that. It gives the contestant the tidy sum of $50,000, and it bestows the bulk of her estate upon the daughter Elizabeth according to testatrix's declared purpose and intention.

We think that, measured by our decisions, there was no question for the jury respecting mental competency,

and that verdict should have been directed for proponent as requested.

Reversed, with costs to proponent and with direction to enter judgment for proponent on the reserved motion.

FEAD, C. J., and NORTH, FELLOWS, WIEST, McDON-ALD, POTTER, and SHARPE, JJ., concurred.