*In re* DWYER'S ESTATE.

1. WILLS—MENTAL COMPETENCY.
    Where there was lay and medical testimony that, at about time will was executed, testatrix was mentally incompetent, essential inquiry is whether will was executed under such circumstances as constituted it conclusive physical evidence of mental competency, against which peculiar conduct and medical opinion have no evidentiary value.

2. SAME—WHEN MENTAL COMPETENCY ESTABLISHED BY WILL.
    Where, in absence of fraud or undue influence, it is shown that testator either wrote or dictated will produced, fact is established that he was capable, mentally and physically, of doing whatever the instrument shows was done.

As to what constitutes capacity or incapacity to make a will, see annotation in 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444.

3. SAME—DECLARATIONS OF TESTATRIX.

Declarations of testatrix are not evidence of the facts stated by her, but evidence merely of her state of mind.

4. WITNESSES—ATTORNEYS ARE COMPETENT WITNESSES FOR CLIENTS.

It is not seemly for attorneys to rush to the aid of their clients with their own testimony, but they are competent witnesses, and conditions arise where their testimony is essential.

5. WILLS—MENTAL COMPETENCY—QUESTION FOR JURY.

Where attorney who drew will failed to testify whether he received directions from testatrix, and there was no direct evidence of what transpired nor of who was present during his conversation with her, required showing that she in fact voluntarily and intelligently dictated terms of will so as to constitute it conclusive evidence of mental competency notwithstanding testimony to contrary was not made, and issue of mental competency was for jury.

6. SAME—WITNESSES—IMPEACHMENT—ERASURES—ALTERATION OF INSTRUMENT.

Where will upon its face bears evidence of writings and erasures in signature of testatrix contrary to testimony of witnesses, their testimony is thereby impeached to extent of raising jury question of conditions surrounding execution of will.

Error to Wayne; Miller (Guy A.), J. Submitted April 22, 1930. (Docket No. 21, Calendar No. 34,084.) Decided October 3, 1930.

Ella F. Riddle presented for probate the last will of Margaret M. Dwyer, deceased. The will was certified to the circuit court under the statute. From judgment for Leo M. Dwyer and another, contestants, proponents bring error. Affirmed.

*Monaghan, Crowley, Reilley & Kellogg* (*Harold T. Coughlan,* of counsel), for proponents.

*John J. Sloan* and *Julius J. Lechner* (*Francis W. Allen,* of counsel), for contestants.

FEAD, J. This is a contest of the will of Margaret Dwyer on the ground of her mental incompetency. Contestants had verdict of a jury and judgment. The principal question is whether the court should have directed a verdict sustaining the will.

The Dwyer family, at one time, consisted of John, who died in 1905, leaving a widow, later deceased, and five children, four of whom survive, Edward and Leo, contestants, Caroline White, and Mary Louise, a nun; Ella F. Riddle, proponent, who has four children, Grace, Margaret, Cass, and Harold; Jeremiah, who died in 1925, Katherine, who died in 1914, Minnie, who died June 30, 1927, Margaret, who died October 8, 1927, all unmarried.

John had been something of a father to his brothers and sisters, had supported and cared for them, and in his will gave them about one-fourth of his estate. The estate was unable to pay the legacies in cash, and they were paid partly in real estate, of small value then, but, through the growth of Detroit, it enhanced greatly in worth and became the foundation of a substantial fortune. There was testimony that, in the course of settlement of the estate, an ill feeling arose on the part of Jeremiah and his sisters against John's widow and the Dwyer branch of the family. There was also evidence that Margaret was friendly to the Dwyer children.

In 1912, Jeremiah and the unmarried sisters executed wills in which, aside from a bequest of $500 to Ella, the estates were devised to the others of them, but without provision for the contingency of none of them surviving. Later Jeremiah changed his will, increasing the bequest to Mrs. Riddle to $1,500, with a devolution to her daughters, Grace,

and Margaret, if she did not survive him. Through these wills the estates finally came to Margaret Dwyer. The unmarried members of the family lived together until their respective deaths.

Margaret's will was drafted by Harold T. Coughlan, an attorney. of record for proponent, and was executed July 16, 1927. It devised all her property to Mrs. Riddle for life, with remainder to Grace and Margaret. It mentioned no other persons. The natural objects of her bounty were Mrs. Riddle and her children and the Dwyers.

Margaret became 77 years of age on August 15, 1927. Minnie had been ill with cancer some five months prior to her death on June 30th. Margaret's anxiety was intense. She had also sustained an attack of sickness in April or May. At the time of Minnie's death she had become thin and weak physically, and, according to witnesses, her conduct indicated a breaking down of her mentality.

On Minnie's death, Margaret's condition became such that the next day and the day following Dr. McKean, who had attended Minnie, was called to treat her. She was nervous from worrying, had arteriosclerosis, chronic nephritis, and an "old lady's heart," which means an excess of fibre and an insufficiency of muscle to function properly. Her physical condition could produce senile dementia. She was not confined to the house but went out driving one or more times. On July 9th she became very ill, Dr. McKean attended her again, a nurse was employed, she gradually got worse, and, on the 15th, was stuporous and drowsy. On the 16th, the doctor thought she was so much better that the will could be executed. She continued ill at her home, under care of Dr. McKean, sometimes worse and sometimes better, until July 27th, when, on the

doctor's advice, she was taken to a hospital at Mt. Clemens, from which she was moved on August 5th to a private sanitarium for nervous diseases, and, on August 11th, taken to a retreat for mental cases, where she died.

It would profit no one to detail the evidence on mental competency. The lay testimony of manifestations of a disordered mental condition covered a period before and after the execution of the will and was in dispute. The doctors agreed that testatrix had senile dementia in her later days. There was medical opinion, upon hypothetical question, that she was so afflicted and was mentally incompetent when the will was executed, and that little less than a miracle could have accounted for a recovery from a stupor on the 15th to mental capacity to execute a will on the 16th. Dr. McKean was the only medical witness who had had personal observation of her about the time the will was executed. He was of the opinion that she did not have senile dementia during the time he treated her. However, he had not been informed of her claimed peculiarities, some of which, if she had them, he said, would be symptomatic of senile psychosis. Upon receiving a report of her conduct at the hospital at Mt. Clemens, he certified under date of July 27th that she had senile dementia. At no time did he make any test, either medical or legal, of her mental capacity. He never talked with her about business, nor sought to discover the condition of her mind. He treated her for her physical ailments. His testimony that she was mentally competent when the will was executed was merely an opinion based upon general personal observation.

The lay and medical testimony clearly presented an issue for the jury. The essential inquiry, then, is

whether the will was executed under such circumstances as constituted it conclusive physical evidence of the mental competency of testatrix, against which peculiar conduct and medical opinion have no evidentiary value.   The rule is concisely stated in *Spratt* v. *Spratt,* 76 Mich. 384:

"Now when, in the absence of fraud or undue influence, it is shown that the testator either wrote or dictated the will produced, the fact is established that he was capable, mentally and physically, of doing whatever the instrument shows was done."

Upon such fact being established, mental competency is proved unless, under the circumstances, "the instrument on its face indicates that it is the emanation of an unsound mind." *Ibid.*  The rule has been followed in a large number of cases, in all of which the testator gave the scrivener the information for the will in private, away from the influence of an interested party, and voluntarily.   See *In re Dowell's Estate,* 152 Mich. 194.; *In re Wynn's Estate,* 193 Mich. 223; *In re VerVaecke's Estate,* 223 Mich. 419; *In re Ferguson's Estate,* 239 Mich. 616; *In re Littlejohn's Estate,* 239 Mich. 630; *In re Fox's Estate,* 240 Mich. 465; *In re Aylward's Estate,* 243 Mich. 9; *In re Lembrich's Estate,* 243 Mich. 39; *In re Spinner's Estate,* 248 Mich. 263.

The rule is not to be unduly extended.   It operates only on credible evidence (*In re Lewandowski's Estate,* 236 Mich. 136) that the testator voluntarily and personally gave the scrivener information which discloses that he had in mind the natural objects of his bounty, the general extent and value of his property, and how he wanted to dispose of it, so that the will itself, executed under such conditions, demonstrates, as an incontrovertible fact, that he had the required mental capacity.

The showing of the circumstances under which the will was drafted rests almost wholly upon the testimony of Grace, Margaret, and Cass Riddle, and in substance was as follows:

The first suggestion to Margaret Dwyer to make a new will came from Mr. Coughlan, Mrs. Riddle's attorney. No prior acquaintance between him and Margaret Dwyer was shown. The suggestion came on July 7th, when Minnie's will was taken from a safety deposit box in the presence of Mr. Coughlan, Margaret, Grace, and Cass Riddle, and a representative of the probate court. Mr. Coughlan volunteered to Margaret that if her will was like Minnie's, her estate would be divided between Mrs. Riddle and the Dwyers. Margaret expressed surprise, said she thought her property would all go to Mrs. Riddle because she had been mentioned in the mutual wills and the Dwyers had not, and asked Mr. Coughlan to come to see her about the will. The next morning, July 8th, Mr. Coughlan called at Margaret Dwyer's home. There was no direct evidence of what transpired nor of who was present during his conversation with Margaret, if he had one about the will. During the day Margaret Dwyer told Grace, Margaret, and Cass Riddle, in effect, that she had directed Mr. Coughlan to draft a will, leaving her property to Mrs. Riddle for life and the remainder to Grace and Margaret, and asked Grace and Cass to see Coughlan and urge him to hurry the will as she did not want the Dwyers to take any of her property.

Assuming this testimony to be true, it was evidence merely of testatrix's state of mind. It did not establish the fact that she had directed drafting of the will nor what it should contain. Declarations of a testatrix are not evidence of the facts stated by

her. *In re Walter's Estate,* 215 Mich. 572; 224 Mich. 211.  Obviously, if she was then mentally incompetent, her declarations could not establish facts which, in turn, would prove her mentally competent. The evidence of what she actually did could come only from those who were present and saw what she did and heard what she said.

Mr. Coughlan did not take the stand and disclose whether he had received directions from Margaret Dwyer, and, if so, what they were.  It is asserted that his failure to testify was due to criticism by this court of attorneys of record testifying in their clients' cases.  *In re Lewandowski's Estate, supra.* Like other criticisms, the remarks of the court in that case must be read in their setting.  It is not seemly for attorneys to rush to the aid of their clients with their own testimony.  But they are competent witnesses and conditions arise where their testimony is essential.  In fact, in *Douglas* v. *Insurance Co.,* 215 Mich. 529, circumstances were disclosed under which it was held that the jury could properly have inferred, from the attorney's failure to testify, that his evidence would have been detrimental to his client.  In any event, the required showing that Margaret Dwyer in fact voluntarily and intelligently dictated the terms of the will was not made.

On July 9th Margaret Dwyer became very ill.  On the 11th, Mr. Coughlan brought the will to the Dwyer home.  He returned again on the 14th.  On the latter occasion the will of Mrs. Riddle, drafted by Mr. Coughlan and claimed to have been ordered at the same time, was executed.  On both days, Dr. McKean told Mr. Coughlan that testatrix was not physically or mentally competent to execute a will.

It was left for Dr. McKean to determine when the will could be signed.

On July 16th the will was executed in the presence of Mrs. Riddle, Grace, Margaret, Dr. McKean, and Edward Walsh. The latter was the doctor's chauffeur, called in to be witness to the will. Mr. Coughlan was out of town. The doctor testified that he talked with Margaret Dwyer some minutes, found her greatly improved, asked her if she wanted to execute her will, she agreed that she did, he started to read it to her, she stopped him, called for her glasses, apparently read it in part, said it was as she wanted it, and it was executed. The other witnesses corroborated this. Walsh thought she read it very rapidly. What part she read, no witness could state. She made no comment on its terms which indicated that she understood the contents of the will nor with reference to her relatives or property. The witnesses said that she first signed "Margaret M. Dwyer Dwyer," at once noticed her mistake, directed Grace to erase it, which was done, then wrote "M. M. Dwyer," and, at Dr. McKean's suggestion, wrote "Margaret" before it. She also signed on the margin of each page. The witnesses said no other changes were made. Upon its face, however, the will bears evidence of other writings and erasures in the signature. Not only was this confirmed by a handwriting expert, but examination of the original will discloses it. The condition of the will itself impeaches the testimony of the witnesses to the extent of raising a jury question of the conditions surrounding the execution of the will. Medical witnesses attached much importance to testatrix's mistake in writing her name, as indicating a confusion of the mind, arising from the mental incompetency of senile dementia. The circumstances do not conclusively show capacity.

The case does not justify the application of the rule that the execution of the will itself is evidence of mental competency, against which medical opinion, upon hypothetical question, is without value, because it was not shown that the will had been dictated by testatrix in fact. The issue of mental incompetency was for the jury under all the testimony.

Proponents present 56 other assignments of error which go to the admission of testimony and the charge of the court. We have examined them carefully and find no reversible error in them. They need no special discussion. The case was tried skilfully, with due regard to the rules of evidence, and the charge was comprehensive and fairly set out the issues.

Judgment is affirmed, with costs.

WIEST, C. J., and BUTZEL, MCDONALD, POTTER, SHARPE, and NORTH, JJ., concurred. CLARK, J., did not sit.